# In the
# United States Court of Appeals
# For the Fifth Circuit

IN RE ADMINISTRATIVE SUBPOENA NO. 25-1431-032

UNITED STATES OF AMERICA,

*Petitioner-Appellee,*

*v.*

RHODE ISLAND HOSPITAL,

*Respondent-Appellant.*

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth
Honorable Reed O'Connor, Chief District Judge
Case No. 4:26-mc-00006-O

## APPENDIX OF EXHIBITS IN SUPPORT OF
## EMERGENCY MOTION FOR STAY PENDING APPEAL

Kathryn M. Barber
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-1227
F: (804) 698-2227
kbarber@mcguirewoods.com

Eric G. Olshan
MCGUIREWOODS LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222
T: (412) 667-7941
F: (412) 667-7991
eolshan@mcguirewoods.com

*(additional counsel listed on inside cover)*

Erin L. Brown
MCGUIREWOODS LLP
Bank of America Tower
50 North Laura Street, Suite
3300
Jacksonville, FL 32202
T: (904) 798-2622
F: (904) 360-6322
ebrown@mcguirewoods.com

*Counsel for Appellant Rhode Island Hospital*

May 9, 2026

# APPENDIX

**TAB      DOCUMENT**

**TAB 1**   Government's Petition for Enforcement of Administrative Subpoena with Exhibits, ECF No. 1 (Apr. 30, 2026)

**TAB 2**   Order Granting the Government's Petition for Enforcement of Administrative Subpoena, ECF No. 2 (Apr. 30, 2026)

**TAB 3**   Notice of Appeal as to Order of Dismissal or Administrative Closure to the Fifth Circuit by Rhode Island Hospital, ECF No. 6 (May 6, 2026)

**TAB 4**   Emergency Motion to Stay, ECF No. 7 (May 6, 2026)

**TAB 5**   Appendix in Support of Motion to Stay Pending Appeal, ECF No. 8 (May 6, 2026)

**TAB 6**   Order Directing Government to Respond to Rhode Island Hospital's Motion for Stay Pending Appeal, ECF No. 9 (May 7, 2026)

**TAB 7**   Government's Response in Opposition to Rhode Island Hospital's Motion for Stay Pending Appeal, ECF No. 11 (May 8, 2026)

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| IN THE MATTER OF ADMINISTRATIVE SUBPOENA 25-1431-032 | NO. 4-26MC-006-0 |

**GOVERNMENT'S PETITION FOR ENFORCEMENT OF ADMINISTRATIVE SUBPOENA PURSUANT TO 18 U.S.C. § 3486(c)**

On July 3, 2025, the Department of Justice (Department) served a Health Insurance Portability and Accountability Act (HIPAA) administrative subpoena on Rhode Island Hospital (RI Hospital), with a return date of Thursday, August 7, 2025. The subpoena is within the Department's statutory authority to investigate violations of the Federal Food, Drug, and Cosmetic Act (FDCA), the information requested is relevant to the Department's inquiry, and the subpoena is neither overbroad nor unduly burdensome. Yet, over ten months after service, RI Hospital has not complied with the subpoena. In fact, it has produced only one six-page document in response to the Department's fifteen document requests. The Department therefore moves for an order compelling RI Hospital to fully comply.

## BACKGROUND

This case concerns an investigation into the distribution of certain prescription drugs to minors with gender dysphoria and related disorders—intended uses for which the Food

Government's Petition to Enforce Administrative Subpoena – Page 1

and Drug Administration (FDA) has determined neither their safety nor effectiveness. These include drugs that suppress the production of sex hormones to delay puberty (commonly referred to as "puberty blockers") and cross-sex hormones meant to induce physical changes to alter the child's secondary sexual characteristics to resemble those typically seen in the opposite sex and less like the individual's biological sex. *See United States v. Skrmetti*, 605 U.S. 495 503-04 (2025) (describing use of these drugs). Although these drugs are approved by FDA for some uses, the agency has not determined that any of these drugs are safe or effective for the treatment of gender dysphoria, nor has FDA approved them for the treatment of gender dysphoria or any other psychiatric disorder.

A primary focus of the Department's investigation—which is being carried out in the Northern District of Texas, *see* 18 U.S.C. § 3486(c)—is potential violations of the FDCA. The FDCA generally prohibits "misbranding" a drug. *See* 21 U.S.C. § 352; *id.* § 331(a)-(c), (k). A drug may be misbranded if, among other things, its labeling is false or misleading, *id.* § 352(a), or if its labeling does not bear adequate directions for its intended use, *id.* § 352(f)(1). "Intended use" means the "objective intent of the persons legally responsible for the labeling of an article (or their representatives)." 21 C.F.R. § 201.128. Such intent "may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives." *Id.* And the "intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer." *Id.* If, for example, a seller "intends an article for different uses than those intended by the person from whom he or she received the article," then the "seller is required to supply adequate labeling in accordance with the new intended uses." *Id.*

Under the FDCA, drug labeling is broadly defined to include any "written, printed, or graphic matter . . . accompanying" the drug. 21 U.S.C. § 321(m). The term "accompanying" includes materials that are separate from but related to the drug and any material that supplements, explains, or is designed for use with the drug. *See id.* § 321(m); 21 C.F.R. § 1.3(a); *Kordel v. United States*, 335 U.S. 345, 349-50 (1948); *United States v. Urbuteit*, 335 U.S. 355, 357 (1948); *United States v. 47 Bottles, More or Less, Etc.*, 320 F.2d 564, 569 (3d Cir. 1963). Labeling can include promotional materials, advertisements, brochures, flyers, instruction sheets, posters, and similar materials.

Misdemeanor violations of the FDCA are punishable on a strict liability basis, without any proof of criminal intent. *See* 21 U.S.C. § 331, § 333(a)(1); *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 91 (1964). For example, if a drug manufacturer or other person causes the distribution of an approved drug for an unapproved use, the manufacturer or other person could be charged with misbranding the drug by distributing it with labeling that lacks adequate directions for its intended uses. 21 U.S.C. §§ 331(a)-(c), (k), 352(f)(1). Where a violator has an intent to defraud or mislead, an FDCA violation may be punishable as a felony. *Id.* § 333(a)(2).

In the investigation of a "Federal health care offense," HIPAA permits the Attorney General to issue a subpoena. 18 U.S.C. § 3486(a)(1)(A)(i)(I). A federal health care offense includes a "violation of, or a criminal conspiracy to violate" 21 U.S.C. § 331, "if the violation or conspiracy relates to a health care benefit program," 18 U.S.C. § 24(a)(2). And a "health care benefit program" is "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual,

and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." *Id.* § 24(b).

Because public or private insurance plans were presented with claims related to off-label use of puberty blockers and cross-sex hormones, such a violation of the FDCA could constitute a "federal health care offense" as defined by 18 U.S.C. § 24. *See* Ex. A (Hsiao Decl.). Accordingly, the Assistant Attorney General signed a HIPAA subpoena, which was served on RI Hospital on July 11, 2025. *See* Ex. B (Subpoena); Ex. C (Proof of Service). After the review of claims data and billing records, the Department is investigating whether RI Hospital patients have received misbranded drugs. Hsiao Decl. ¶ 36. Also, the Department has reason to suspect that RI Hospital employees might have engaged in false billing concerning patients suffering from gender dysphoria. *Id.* ¶¶ 37–38. Medical records from other pediatric hospitals suggest that RI Hospital is not unique in this regard. *Id.* ¶ 39. The return date specified in the subpoena was reasonable and was set as August 7, 2025. Hsiao Decl. ¶ 46; Ex. B. But, to date, RI Hospital remains non-complaint. Indeed, over the past ten months, RI Hospital has provided only *one* document totaling *six* pages. Hsiao Decl. ¶ 46.[1]

---

[1] Partial compliance does not foreclose a petition to enforce. *See, e.g., Equal Emp. Opportunity Comm'n v. MTV Food, Inc.*, No. 23-MC-278, 2024 WL 4164507, at *1 (S.D.N.Y. Sept. 12, 2024) (granting petition to enforce in the absence of full compliance); *United States v. Sysco Corp.*, 25 F. Supp. 2d 684, 685 (D. Md. 1998) (granting a motion to enforce after the recipient "only partially complied with the subpoenas"); *see also United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 488 (5th Cir. 2014) (affirming judgment granting petition to enforce after the recipient "failed to comply fully" with the subpoenas").

## ARGUMENT

The Fifth Circuit "has consistently recognized the summary nature of administrative subpoena enforcement proceedings," *Burlington N. R. Co. v. Off. of Inspector Gen., R.R. Ret. Bd.*, 983 F.2d 631, 637 (5th Cir. 1993), and said that "when reviewing an administrative subpoena, the court plays a strictly limited role," *Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Bd.*, 878 F.2d 875, 879 (5th Cir. 1989). The requirements for enforcement are "minimal"—"courts will enforce an administrative subpoena if: (1) the subpoena is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome." *Burlington N. R. Co.*, 983 F.2d at 637-38; *see United States v. Zadeh*, 820 F.3d 746, 756 (5th Cir. 2016) (applying this standard "in the context of an administrative subpoena seeking an individual's medical records"). Here, all three prerequisites are met. *See United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 489 (5th Cir. 2014) (explaining that the Government has the "minimal" burden of making a "prima facie case").[2]

## I.   The Subpoena Is Within the Department's Statutory Authority.

An agency's subpoena must be enforced unless it is "plainly incompetent or irrelevant to any lawful purpose." *Fed. Election Comm'n v. Lance*, 617 F.2d 365, 368 (5th Cir. 1980) (quoting *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943)); *accord,*

---

[2] To the extent the Fifth Circuit also requires a showing that "the required administrative steps have been followed," *Burlington N. R. Co.*, 983 F.2d at 637 n.2, the Department meets that requirement too. The subpoena was signed by the Assistant Attorney General, properly served on RI Hospital, and calls for the production of nonprivileged documents relevant to the investigation within 500 miles of RI Hospital. *See* Subpoena; 18 U.S.C. § 3486(a)(3).

*e.g.*, *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 5–6 (1st Cir. 1996) ("As long as the agency's assertion of authority is not obviously apocryphal, a procedurally sound subpoena must be enforced.").

The subpoena at issue is plainly relevant to a lawful purpose. Congress has expressly authorized the Attorney General to issue subpoenas to investigate potential "Federal health care offense[s]," including qualifying offenses in the FDCA. 18 U.S.C. § 3486(a)(1)(A)(i)(I). The subpoena in this case was issued for that very purpose, as described above. The subpoena to RI Hospital will assist the Department's efforts to "investigate Federal health care offenses," Subpoena at 1. Accordingly, the subpoena issued to RI Hospital plainly comes within the Department's statutory authority. *See Burlington N. R. Co.*, 983 F.2d at 637-38.

## II.    The Subpoena Seeks Documents Reasonably Relevant to the Investigation.

The subpoena seeks information "reasonably relevant" to the Department's investigation in two different ways. *Burlington N. R. Co.*, 983 F.2d at 638; *see FTC v. Texaco, Inc.*, 555 F.2d 862, 874 (D.C. Cir. 1977) (en banc) ("[I]n the pre-complaint stage, . . . the relevance of the agency's subpoena requests may be measured only against the general purposes of its investigation."). First, the Department seeks records to determine whether RI Hospital itself may have engaged in conduct that implicates the FDCA. Second, the Department seeks records from RI Hospital to determine whether manufacturers and distributors of the drugs at issue may have violated the FDCA.

In the subpoena are 15 Requests, all of which extend from January 1, 2020, to the present. *See* Subpoena at 4, 7-9. The fifteen requests can be broadly broken down into four

Government's Petition to Enforce Administrative Subpoena – Page 6

main categories: (1) requests related to personnel and corporate oversight (Request 1); (2) requests related to billing, coding, and reimbursement practices (Requests 2–6); (3) requests related to the practice's relationships with drug manufacturers, distributors, and pharmacies (Requests 7–10); and (4) requests regarding clinical practices and drug safety (Requests 11–15). As the Hsiao Declaration explains, all 15 requests—and all four categories—are reasonably related to identifying evidence that could be used to shed light on the Government's lawful investigation. *See* Hsiao Decl. ¶¶ 40–44.

Request 1 seeks information to identify who had authority to direct prescribing, billing, or marketing practices to determine liability. Subpoena at 7. Under strict liability doctrines, including the responsible corporate officer doctrine, officers and responsible personnel can be held criminally liable for FDCA violations even without direct participation. Hsiao Decl. ¶ 41. Personnel files also show financial incentives, disciplinary history, and/or training which can establish knowledge and intent. *Id.*

Requests 2 through 6 (regarding billing, coding, and reimbursement practices) are necessary to determine whether the clinic disguised treatment for gender-related mental disorders as another, physical illness (e.g., endocrine disorder) to disguise or hide potential FDCA violations and potentially secure health care benefit program reimbursements through fraud. Subpoena at 7-8; Hsiao Decl. ¶ 42. Such practices are especially important to demonstrate an "intent to defraud or mislead" under 21 U.S.C. § 333(a)(2) if the clinic misrepresented the intended use of the drugs. Hsiao Decl. ¶ 42. Moreover, training materials and internal discussions can reveal whether improper coding was a deliberate strategy. *Id.*

**Government's Petition to Enforce Administrative Subpoena – Page 7**

Requests 7 through 10 (relating to relationships with drug manufacturers, distributors, and pharmacies) seek evidence of an intent to market or promote drugs for unapproved uses in violation of the FDCA. Subpoena at 8; Hsiao Decl. ¶ 43. Communications between pharmaceutical sales representatives and prescribing physicians can provide evidence of off-label promotion, which would be relevant to an FDCA prosecution for misbranding drugs. *See, e.g.*, Information at 4-5, ¶¶ 12-18, *United States v. Cephalon, Inc.*, No. 2:08-cr-598 (E.D. Pa. Sep. 29, 2008), Dkt. No. 1; Press Release, U.S. Dep't of Just., *Eli Lilly and Company to Pay U.S. $36 Million Relating to Off-Label Promotion* (Dec. 21, 2005), https://perma.cc/2Y64-FUK5 (announcing guilty plea of drug manufacturer involving illegal off-label promotion and highlighting evidence that the defendant "[e]ncourag[ed] sales representatives . . . to send unsolicited medical letters to promote the drug for an unapproved use to doctors").[3] If RI Hospital, or one of its affiliated health care providers, received promotional materials, "scientific exchange information," or payments to encourage prescribing of puberty blockers or cross-sex hormones, such information would support a FDCA theory (including conspiracy) involving the illegal misbranding of drugs and distribution of misbranded drugs or unapproved new drugs.

---

[3] There are many similar examples. *See, e.g.*, Press Release, U.S. Dep't of Just., *Genzyme Corporation to Pay $32.5 Million to Resolve Criminal Liability Relating to Seprafilm* (Sep. 3, 2015), https://perma.cc/P7AT-MUVT (highlighting evidence that manufacturer encouraged off-label uses by distributing promotional materials citing a misleading scientific study); *United States v. Endo Pharms., Inc.*, No. 1:14-CR-66 (N.D.N.Y. Feb. 21, 2014), Dkt. 2 (deferred prosecution agreement regarding drug manufacturer's off-label promotion of drug, highlighting evidence that manufacturer distributed a misleading scientific study and promoted off-label uses at educational presentations for physicians); Press Release, U.S. Dep't of Just., *Wyeth Pharmaceutical Agrees to Pay $490.9 Million for Marketing the Prescription Drug Rapamune for Unapproved Uses* (July 30, 2013), https://archives.fbi.gov/archives/oklahomacity/press-releases/2013/wyeth-pharmaceutical-agrees-to-pay-490.9-million-for-marketing-the-prescription-drug-rapamune-for-unapproved-uses (highlighting evidence that manufacturer paid bonuses to incentivize off-label sales).

Government's Petition to Enforce Administrative Subpoena – Page 8

Hsiao Decl. ¶ 43. Similarly, information regarding financial arrangements (consulting agreements, sponsorships, speaking honoraria) may suggest improper influence to reinforce a showing of an intent to misbrand the drugs, including with an intent to defraud or mislead. *Id.*

Requests 11 through 15 (relating to patient-level clinical practices and drug safety) will permit the United States to evaluate the scope of prescribing (including the number and age range of patients treated), and consistency of diagnoses. Subpoena at 8-9; *see* Hsiao Decl. ¶ 44. Such information also establishes the scope of interstate distribution and the scale of potential FDCA violations. Hsiao Decl. ¶ 44. Linking each patient's clinical record to corresponding billing and insurance claims can demonstrate whether diagnoses were miscoded, which can prove fraudulent intent. *Id.* Documentation of clinical justification, informed consent, and disclosure of unapproved use is key to assessing whether the clinic (and/or potential co-conspirators) concealed or downplayed risks associated with the unapproved use of these drugs. *Id.* Absence or minimization of such warnings could establish the intent to mislead. *Id.* Patient charts also typically capture adverse outcomes, side effects, and complications of drug use. *Id.* By reviewing multiple patient records, the investigative team may reveal systemic use of the same masking codes and fraudulent informed consent documents. *Id.* This enables investigators to distinguish between mere errors and an institutionalized practice.

Providing patient records including patient identities can also provide essential investigative leads. *Id.* Parents may be witnesses about what disclosures were made. Patients (depending on age and circumstances) may provide information about the

informed consent process, side effects, or other false or misleading information about the drugs conveyed during treatment. *Id.* Health benefit programs tied to identified patients could provide additional information including claim records, creating a reinforced evidentiary record. *Id.* In sum, without this information, the Government cannot fully determine the scope of the violations, identify patterns of misbranding or fraudulent billing, or assess whether the conduct was undertaken with intent to defraud or mislead, as required for felony liability under 21 U.S.C. § 333(a)(2).

For these reasons, the information sought is "reasonably relevant," *Morton Salt,* 338 U.S. at 652, to the "general purposes of the agency's investigation," *Dow Chem. Co. v. Allen,* 672 F.2d 1262, 1268 (7th Cir. 1982) (alteration adopted and quotation omitted)). Accordingly, the Court should enforce the subpoena. *See United States v. Zadeh,* No. 4:14-CV-105-O, 2015 WL 418090, at *7 (N.D. Tex. Jan. 31, 2015) (O'Connor, J.) ("For the purposes of administrative subpoenas, the notion of relevancy is a broad one, and so long as the material requested touches a matter under investigation, the subpoena will survive a challenge that it is not relevant.").

## III.    The Subpoena's Demands Are Reasonable.

Finally, the subpoena's demands are "not unreasonably broad or burdensome." *Burlington N. R. Co.,* 983 F.2d at 638.

Because the Department's "inquiry" is "a relatively broad one," "the permissible scope of materials that [can] reasonably be sought [is] necessarily equally broad." *McPhaul v. United States,* 364 U.S. 372, 382 (1960); *see Securities & Exch. Comm'n v. McGoff,* 647 F.2d 185, 192-93 (D.C. Cir. 1981) ("We agree that the demands are broad.

Government's Petition to Enforce Administrative Subpoena – Page 10

But the nature of the inquiry precludes a trim list of requests." (footnote omitted)). And the Department's requests are not atypical in this area. *See, e.g., In re Subpoena Duces Tecum,* 228 F.3d 341, 350 (4th Cir. 2000) ("[I]f Bailey had treated 15,000 patients over a period of seven years and all of them were reimbursed on claims he submitted, a suspicion of fraud on these claims would justify a review of Bailey's documentation of services to these patients, of the claims submitted on their behalf, and of the reimbursements collected."); *cf. Zadeh,* 820 F.3d at 758 (agreeing that "the subpoena was not unduly broad or burdensome albeit implicating privacy interests of patients whose records are produced but are not parties to this litigation"). The Department's requests are also limited in "time and scope," asking only for records since January 1, 2020. *Zadeh,* 2015 WL 418090 at *5.

The subpoena is also not unduly burdensome. The information sought is relevant and not otherwise available, meaning that the subpoena is "unreasonably burdensome" only if "compliance threatens to unduly disrupt or seriously hinder normal operations of a business." *F.T.C. v. Jim Walter Corp.,* 651 F.2d 251, 258 (5th Cir. 1981) (quotation omitted), *abrogated on other grounds as recognized by Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 943 (11th Cir. 1997). RI Hospital has not presented to the Department any evidence demonstrating that compliance with the subpoena would cause such a disruption or hindrance. *Id.* ("The subpoenaed party may not merely utter the claim; it must persuade us."). Notably, other hospitals to whom the

Department issued similar subpoenas have complied with the subpoena without any disruption or hindrance. The Court therefore should enforce the subpoena in its entirety.[4]

## CONCLUSION

The Government respectfully requests an order from the Court compelling Rhode Island Hospital to comply with the subpoena.

Dated:  April 30, 2026

Respectfully submitted,

RYAN RAYBOULD
United States Attorney

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director
Enforcement and Affirmative Litigation
    Branch

---

[4] The Fifth Circuit has provided that "[c]ourts will not enforce an administrative subpoena . . . if the subpoena was issued for an improper purpose, such as harassment." *Burlington N. R. Co.*, 983 F.2d at 638. The Department acknowledges that a handful of mistaken district judges have found "improper purpose" given the administration's policy positions and priorities. *See, e.g.*, *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1303-04 (W.D. Wash. 2025); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass. 2025). These decisions are wrong and currently on appeal. There is no basis in law or logic to conclude that an administration's policy positions prevent it from enforcing existing federal law. And, given that existing federal law, even if an administration's policy views might be treated as an improper purpose, this is no reason to deny the Department's motion. Denial is only warranted when the sole purpose behind a subpoena's issuance is an improper one. *See Donaldson v. United States*, 400 U.S. 517, 533 (1971) (inquiring whether "the sole objective of the investigation is to" impermissibly use a civil subpoena to "obtain evidence for use in a criminal prosecution"); *Lynn v. Biderman*, 536 F.2d 820, 826 (9th Cir. 1976) ("It is not . . . a ground to deny enforcement of a subpoena that it is being employed for a wrongful purpose if there is also a legitimate purpose for the subpoena.").

**Government's Petition to Enforce Administrative Subpoena – Page 12**

/s/ Patrick R. Runkle
ROSS S. GOLDSTEIN
PATRICK R. RUNKLE
Assistant Directors
SCOTT DAHLQUIST
Trial Attorney

U.S. Department of Justice
Enforcement and Affirmative Litigation
    Branch
P.O. Box 386
Washington, DC 20044
Tel: (202) 353-4218
ross.goldstein@usdoj.gov

ETHAN WOMBLE
Assistant United States Attorney
U.S. Attorney's Office
State Bar No. 24102757
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Fax: 214-659-8809
ethan.womble@usdoj.gov

# Exhibit A

## DECLARATION OF LISA K. HSIAO

Pursuant to 28 U.S.C. § 1746, I, Lisa K. Hsiao, hereby declare as follows:

### GENERAL BACKGROUND

1.    I am the Acting Director of the Enforcement and Affirmative Litigation Branch ("EALB") of the Civil Division of the United States Department of Justice.

2.    EALB's Enforcement Section ("ES") is the successor to the Consumer Protection Branch ("CPB") and is vested with CPB's legal authorities, including handling investigations and litigation arising under federal statutes that protect consumers' health, safety, economic security, and identity integrity. ES, as the successor to CPB, is authorized to oversee and conduct all civil and criminal matters arising under the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301, et seq., and related matters. *See* 28 C.F.R. § 0.45(i) and Justice Manual 4-8.000, 4-1.313.

3.    EALB-ES is currently conducting an investigation of potential violations of the Food, Drug, and Cosmetic Act (FDCA) relating to the on- or off-label use by manufacturers and distributors of drugs, including puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called "gender transition."

4.    The Attorney General may authorize other officers of the Department of Justice to perform certain functions of the Attorney General. *See* 28 U.S.C. § 510. In any investigation of a federal health care offense, the Attorney General may issue in writing and cause to be served a subpoena requiring the production and testimony described in 18 U.S.C. § 3486(a)(l)(B). *See* 18 U.S.C.§ 3486(a)(l)(A).

1

5. Pursuant to Attorney General Order Number 3591-2015, dated November 10, 2015, the Attorney General authorized the Assistant Attorney General for the Civil Division to issue and serve administrative subpoenas pursuant to 18 U.S.C. §§ 3486(a)(l)(A) and (a)(l)(B) to investigate violations of the FDCA that relate to a health care benefit program.

6. Under the authority of 18 U.S.C. § 3486 and the Attorney General's delegation of authority, on July 3, 2025, the Assistant Attorney General for the Civil Division, Brett A. Shumate, lawfully issued an administrative subpoena to Rhode Island Hospital ("RIH") in connection with an investigation being conducted in my office. The subpoena was served on RIH on July 11, 2025.

7. The facts in this Declaration come from my personal observations, my training and experience, and information obtained from other government personnel. This Declaration is intended to demonstrate that the administrative subpoena discussed herein was issued in the furtherance of an investigation authorized by law and that the records and other things the subpoena seeks are relevant to that investigation. Accordingly, this Declaration does not set forth all my knowledge about this matter.

### LEGAL BACKGROUND

8. Among other statutory and regulatory authorities, EALB-ES investigates and brings actions to enforce the FDCA. The overriding purpose of the FDCA is to protect the public health. *United States v. Article of Drug … Bacto-Unidisk*, 394 U.S. 784, 798 (1969). The FDCA's purpose should "infuse construction of the [FDCA]" so that courts give the FDCA a liberal construction that furthers protection of the public health,

including in criminal enforcement of the FDCA. *United States v. Dotterweich*, 320 U.S. 277, 280 (1943); *see also United States v. Park*, 421 U.S. 658, 672–73 (1975). This consideration applies even more strongly where the Government seeks to enforce the FDCA to protect the health of children.

9. A "Federal healthcare offense" for purposes of a subpoena issued under 18 U.S.C. § 3486 is defined by 18 U.S.C. § 24(a) as, *inter alia,* "a violation of, or a criminal conspiracy to violate … section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 331) … if the violation or conspiracy relates to a health benefit program." 18 U.S.C. § 24(a). The statute defines "health care benefit program" to mean "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b). A subpoena issued under section 3486 (commonly referred to as a "HIPAA subpoena") may be used to investigate both substantive violations of the FDCA, as well as conspiracies to violate the FDCA if the violation or conspiracy relates to products or services that might ultimately be paid for by a private or public health insurance program.

10. Administrative subpoenas issued under 18 U.S.C. § 3486 are routinely used to obtain categories of medical, billing, and related information in federal healthcare offense investigations. The materials requested by the subpoenas issued in this investigation fall within that framework and include the same kinds of records—patient files, insurance submissions, treatment documentation, and communications (such as emails)—that

federal investigators typically review to determine whether a federal health care offense may have occurred.

### FDA's Approval of Drugs

11.    The FDCA regulates the development, manufacturing and distribution of drugs in the United States. For a "new drug" to enter interstate commerce, the manufacturer must first demonstrate to the United States Food and Drug Administration ("FDA") that the drug is both safe and effective for each of its intended uses. 21 U.S.C. §§ 331(d), 355(a). The introduction into interstate commerce of an unapproved new drug violates the FDCA. 21 U.S.C. § 331(d).

12.    A drug manufacturer obtains FDA approval for a new drug through a new drug application ("NDA") that demonstrates its drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a). As part of the approval process, FDA reviews the proposed labeling for the drug in the NDA, which must include adequate directions for how to use the drug for each of its intended uses. 21 U.S.C. § 352(f); 21 C.F.R. § 201.5. When FDA approves an NDA, it determines that the drug is safe and effective **for the specific use or uses identified in the application.** As part of that approval, FDA also approves the product's proposed labeling, including prescribing information, as providing adequate directions for use for those approved indications. FDA's approval of a drug for one or more particular uses does **not** mean that the drug is safe and effective for unapproved uses, nor does approval mean that the labeling provides adequate directions for unapproved uses. While physicians are permitted to prescribe an FDA-approved drug for an unapproved use, such prescribing may warrant investigation because it may provide evidence of FDCA violations by others. *See, e.g., infra* ¶¶ 13–18. Also, depending on the circumstances, prescribing for unapproved uses can itself involve FDCA violations—for example, where the physician is engaged in the distribution or labeling of an unapproved drug.

4

## MISBRANDING OF DRUGS PRESCRIBED FOR UNAPPROVED USES THROUGH ILLEGAL LABELING

13. A drug is misbranded if its labeling does not have adequate directions for the use of the drug. 21 U.S.C. § 352(f). FDA-approved labeling contains directions only for the drug's approved uses. If a drug manufacturer or other person distributes an approved drug for an unapproved use, the manufacturer or other person could be charged with misbranding the drug or distributing a misbranded drug with labeling that lacks adequate directions for its intended uses.[1] 21 U.S.C. §§ 331(a), 331(b), 331(c), 331(k), and 352(f)(1). Enforcement's predecessor, CPB, participated in successful prosecutions of drug manufacturers for such illegal conduct. *See, e.g.*, *United States v. Pharmacia & Upjohn Co.*, Case No. 09-CR-10258-DPW (D. Mass. 2009); *United States v. Eli Lilly & Co.*, Case No. 09-CR-00020-RK (E.D. Pa. 2009).

14. A drug is also misbranded if its labeling is false or misleading in any particular. 21 U.S.C. § 352(a).

15. Under the FDCA, drug labeling is broadly defined as any "written, printed, or graphic matter … *accompanying*" the drug. 21 U.S.C. § 321(m) (emphasis added). The term "accompanying" is interpreted broadly and includes materials that are separate from the drug but nonetheless related to it, including any material that supplements, explains, or is designed for use with the drug. *See* 21 U.S.C. § 321(m); 21 C.F.R. § 1.3(a); *Kordel v. United States*, 335 U.S. 345 (1948); *United States v. Urbuteit*, 335 U.S. 355 (1948); *United States v. 47 Bottles … Jenasol RJ Formula 60*, 320 F.2d 564, 569 (3d Cir. 1963) (literature shipped by company to sales agent and then stored in agent's bedroom closet was labeling: "[I]t cannot be said that …the Court promulgated or intended to promulgate a requirement that there be an actual use in order that the literature constitute labeling.").

---

[1] As noted above, it is possible for doctors to prescribe an approved drug for an unapproved use without violating the FDCA.

5

Labeling can include promotional materials, advertisements, brochures, flyers, instruction sheets, posters, and similar materials.

16. If a drug manufacturer or other person distributes (or causes the distribution of) an approved drug with false or misleading labeling for an unapproved use, the manufacturer or other person could possibly be charged with misbranding the drug or distributing a misbranded drug. 21 U.S.C. §§ 331(a), 331(b), 331(c), 331(k), and 352(a). Enforcement's predecessor, CPB, participated in successful prosecutions of manufacturers for false and misleading labeling. *See, e.g., United States v. Avanos Medical, Inc.*, Case No. 21-CR-0307-E (N.D. Tex. 2021) (deferred prosecution agreement for false and misleading labeling for medical device).

### ILLEGAL DISTRIBUTION OF AN UNAPPROVED NEW DRUG

17. A "new drug" is any drug that is "not generally recognized, among [qualified] experts . . . as safe and effective for use under the conditions prescribed, recommended, or suggested in the *labeling* thereof …." 21 U.S.C. § 321(p)(1) (emphasis added). Even if a substance has been on the market for years, it can be a "new drug" if used for an indication that has not been approved by FDA and is not generally recognized as safe and effective for that indication.

18. If a drug manufacturer or other person distributes (or causes the distribution of) an approved drug for an unapproved use with labeling for that unapproved use, the manufacturer or other person could be charged with distributing an unapproved new drug in violation of the FDCA. 21 U.S.C. § 331(d).

### INTENT IN FDCA CRIMES

19. A violation of 21 U.S.C. § 331 is a federal criminal offense that is punished as a strict liability misdemeanor without any proof of criminal intent. *See Park*, 421 U.S. at 672–73; *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 91 (1964). Through its strict liability misdemeanor provision, the FDCA imposes rigorous criminal

accountability on companies and individuals involved with drugs that affect the health of consumers in circumstances where consumers realistically cannot protect themselves. *See Wiesenfeld*, 376 U.S. at 91; *Dotterweich*, 320 U.S. at 280–81. This heightened accountability is even more acute when the consumers at risk are children. Consequently, any violation of Section 331, including the causing of any prohibited act listed in Section 331, is a federal crime, even in the absence of any criminal intent.

20. A felony FDCA violation requires the same conduct as the strict liability misdemeanor, but with the added element of an intent to defraud or mislead. 21 U.S.C. § 333(a). Evidence of intent to defraud or mislead—whether directed at a government agency, a patient, or an insurance company—thus transforms a misdemeanor FDCA violation into a felony offense. Evidence of an intent to defraud or mislead a government agency or another third-party, such as a patient or insurer, in connection with an FDCA violation is sufficient to establish a felony FDCA offense. Efforts to conceal a violation or evade detection also can demonstrate the requisite intent to defraud or mislead.

### THE DRUGS AT ISSUE IN THIS INVESTIGATION

21. This investigation focuses on prescription drugs typically used in gender-related care for children and adolescents suffering from a recognized mental disorder known amongst clinicians as "gender identity disorder" or, as the most recent version of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS refers to it, "gender dysphoria." Included in this group of prescription drugs are (1) drugs used to suppress the production of sex hormones to delay puberty—the most common being gonadotropin-releasing hormone agonists ("GnRH agonists"), commonly referred to as "puberty blockers;" and (2) cross-sex hormones meant to induce physical changes to alter the child's secondary sexual characteristics to resemble those typically seen in the opposite

sex and less like the individual's biological sex. Testosterone, a Schedule III controlled substance under the Controlled Substances Act, is included in this latter group.

22.   FDA has not determined these drugs to be either safe or effective for the treatment of gender dysphoria. Nor has FDA approved any of these drugs for the treatment of gender dysphoria or any other psychiatric disorder. While these prescription drugs are FDA-approved for other indications (*e.g.*, precocious puberty, prostate cancer, hypogonadism, etc.), FDA has not approved any NDA that establishes the safety and efficacy of these drugs for use in minors with gender dysphoria. As explained above, introducing a such "new drug" into interstate commerce without an FDA-approved indication is unlawful. Thus, to the extent these drugs are intended to treat gender dysphoria in minors, they constitute unapproved new drugs under federal law, and their distribution for that unapproved indication violates the FDCA and is a federal crime.

23.   Some of these drugs, including puberty blockers, are not administered orally. Rather, they are typically administered by injection by a medical professional or through an outpatient surgical procedure to implant the drug. Puberty blockers are typically implants or injectables that require administration by a physician or nurse in a medical facility that must purchase, store, and administer the drug, placing healthcare providers in the chain of distribution of that drug. Similarly, testosterone may be, and often is, administered by injection.

24.   The United States Government is aware of credible, publicly available evidence relating to the widespread practice of prescribing cross-sex hormones and puberty blockers to treat gender dysphoria in minors that casts doubt on the safety and efficacy of

8

this practice. The United States Department of Health and Human Services ("HHS"), of which FDA is a component agency, has determined that the evidence for the safety and efficacy of these drugs for the treatment of gender dysphoria in minors is weak. *See generally*, U.S. DEP'T OF HEALTH & HUMAN SERVS., TREATMENT FOR PEDIATRIC GENDER DYSPHORIA, REVIEW OF EVIDENCE AND BEST PRACTICES (Nov. 19, 2025) t https://opa.hhs.gov/gender-dysphoria-report("HHS REVIEW"). Specifically, this report found that some of the pharmacologic interventions under investigation here "carry risk of significant harms including infertility/sterility, sexual dysfunction, impaired bone density accrual, adverse cognitive impacts, cardiovascular disease and metabolic disorders, [and] psychiatric disorders." *Id.* at 10. HHS further determined that "the overall quality of [scientific] evidence concerning the effects of any intervention on psychological outcomes, quality of life, regret, or long-term health is **very low**." *Id.* at 13 (emphasis added).

25. In December, 2025, the Assistant HHS Secretary for Health, Admiral Brian Christine, M.D., issued a public health message to healthcare providers stating that: "Current evidence does not support claims that puberty blockers, cross-sex hormones, and surgeries are safe and effective treatments for pediatric gender dysphoria … Healthcare providers caring for children and adolescents with gender dysphoria should refuse to provide puberty blockers, cross-sex hormones, or surgical interventions to children and adolescents, as these treatments pose unnecessary and disproportionate risks of harm with insufficient evidence of benefit." U.S. Dep't of Health & Human Servs., *Evidence-Based Care for Children and Adolescents with Gender Dysphoria* (Dec. 18,

9

2025), https://health.gov/sites/oash/files/Message_Pediatric_Gender_Dysphoria_ Treatment.pdf.

26.    The Government is also aware of other major scientific publications and national health authorities that have questioned the strength and quality of the evidence base for the efficacy of puberty blockers and other medical interventions to treat youth for gender dysphoria. In the United Kingdom, for example, the British National Health Service ("NHS") commissioned an independent review led by Dr. Hilary Cass, a pediatrician and the former President of the Royal College of Paediatrics and Child Health, to evaluate how NHS was providing care for children experiencing gender-related distress. *See generally* NHS England, *Independent Review of Gender Identity Services for Children and Young People: Final Report* (Apr. 10, 2024), https://cass.independent-review.uk/home/publications/final-report/ ("*Cass Review*"). Dr. Cass's review concluded: "This is an area of remarkably weak evidence, and yet results of studies are exaggerated or misrepresented by people on all sides of the debate to support their viewpoint. The reality is that we have no good evidence on the long-term outcomes of interventions to manage gender-related distress." *Cass Review* at 13.

27.    With regard to puberty blockers, Dr. Cass reported that a systematic review conducted by the University of York "found no evidence that puberty blockers improve body image or dysphoria" while "a known side effect of puberty blockers on mood is that it may reduce psychological functioning." *Id.* at 179. With regard to cross-sex hormones, the *Cass Review* agreed with another systematic review that concluded that: "There is a lack of high-quality research assessing the outcomes of hormone interventions in

adolescents with gender dysphoria/incongruence, and few studies that undertake long-term follow up. No conclusions can be drawn about the effect on gender dysphoria, body satisfaction, psychosocial health, cognitive development, or fertility. Uncertainty remains about the outcomes for height/growth, cardiometabolic and bone health." *Id.* at 184.

28. As a result of the *Cass Review*'s findings, in December 2024, the United Kingdom banned puberty blocker treatment for gender dysphoria. *See* Press Release, U.K. Department of Health & Social Care, *Ban on Puberty Blockers to be Made Indefinite on Experts' Advice* (Dec. 11, 2024), https://www.gov.uk/government/news/ban-on-puberty-blockers-to-be-made-indefinite-on-experts-advice (stating that "there is currently an unacceptable safety risk in the continued prescription of puberty blockers to children"). Press reports indicate that the U.K. is similarly considering banning cross-sex hormones for minors. *See* Alison Holt, *Cross-Sex Hormones for Under 18s Could be Restricted or Banned*, BBC News (May 22, 2025), https://www.bbc.com/news/articles/cg711xevd89o.

29. Several other countries have likewise enacted restrictions on the use of these pharmacologic interventions for treating gender-related disorders in minors, or are considering them. *See, e.g.*, *Sweden Puts Brakes on Treatments for Trans Minors*, FRANCE 24 (Aug. 2, 2023), https://www.france24.com/en/live-news/20230208-sweden-puts-brakes-on-treatments-for-trans-minors; Siobhan Harris, *Europe & the Puberty Blocker Debate*, MEDSCAPE MED. NEWS (Apr. 25, 2024), https://www.medscape.com/viewarticle/europe-and-puberty-blocker-debate-2024a1000831 (reporting on European countries' practices and findings including

11

France's National Academy of Medicine recommendation that the "greatest reserve" be used in puberty blockers and/or hormones in children and adolescents; Sweden's conclusion that the risks of puberty blockers and hormones currently outweigh the potential benefits); *New Zealand Halts New Puberty Blockers for Young Transgender People*, NBC NEWS, (Nov. 20, 2025), https://www.nbcnews.com/world/asia/new-zealand-halts-new-puberty-blockers-young-transgender-people-rcna244925.

30.    Most recently, just last month researchers analyzed a large Finnish nationwide cohort (2,083 gender disordered individuals matched with 16,643 controls) and found that adolescents who were referred for gender-identity services (such as hormonal or surgical treatment) had substantially higher rates of severe psychiatric morbidity than matched peers—both before and after treatment. The study determined that these patients' psychiatric needs not only persisted after undergoing sex-rejecting medical interventions, but even intensified. Those who underwent such procedures had elevated risks of psychiatric morbidity, "with hazard ratios approximately three times higher than female controls and five times higher than male controls." Sami-Matti Ruuska et al., *Psychiatric Morbidity Among Adolescents Who Contacted Specialised Gender Identity Services in Finland in 1996–2019: A Register Study*, ACTA PAEDIATRICA (2026), https://doi.org/10.1111/apa.70533.

31.    Both the HHS review and the UK's independent *Cass Review*—along with numerous other systematic reviews of the evidence that the government is aware of— justify questioning the scientific foundation for prescribing puberty blockers and cross-sex hormones for minors. Not only has FDA not approved them for these purposes, but it

12

is far from certain, therefore, that prescribing these drugs would ever be considered by the agency as safe and effective for that indication. To the contrary, the available public record suggests there is serious potential for harm.

### EVIDENCE OF FDCA AND HEALTH CARE FRAUD VIOLATIONS IN PEDIATRIC GENDER-RELATED CARE

32.   From testimonies of public whistleblowers and leading national medical experts on the subject matter, the Government is aware of potential violations of federal law in connection with the provision of gender-related treatments for minors occurring at healthcare providers across the country.

33.   This includes allegations and evidence of fraudulent billing practices to secure insurance coverage/payment. Such practices include, but are not limited to, providers (i) using the incorrect diagnosis and/or billing code (*e.g.*, "endocrine disorder, unspecified" instead of "gender dysphoria" to prescribe cross-sex hormones, or "precocious puberty" instead of "gender dysphoria" to prescribe puberty blockers) because they know that certain insurance plans may not cover the off-label prescription of puberty blockers or cross-sex hormones for gender-related treatment[2]; (ii) changing or misrepresenting a patient's sex in the medical records and coding and billing for "endocrine imbalance," which is supported by accompanying bloodwork showing endocrine levels atypical of the incorrectly documented sex (but consistent with the patient's actual sex); and (iii) fraudulently making a gender dysphoria diagnosis where patients do not meet the DSM-5

---

[2]   In fact, one nonprofit organization has published guidance to health care providers advising them of "coding alternatives for trans healthcare," which detailed "codes that are commonly rejected by insurance providers" and "codes that are commonly accepted by insurance providers."

diagnostic criteria, but the providers know that the carrier or plan will cover off-label prescription of cross-sex hormones or puberty blockers to treat gender dysphoria.

34. The Government also knows of evidence and allegations of many cases where providers failed to supply adequate labeling and to give the information necessary to obtain informed consent, actively deceived patients and parents with false claims and statements regarding the drugs' effectiveness or alternatives, and misrepresented to minor patients and their parents the risks associated with and the science claimed to support taking the drugs described herein for gender dysphoria.

35. The Government has also reviewed evidence (including transcripts and video recordings) from national conferences on treating patients with gender dysphoria, including minors, wherein presenters describe and encourage attendees to engage in the provision of purely patient-driven care (or "embodiment goals"), with little regard for gender dysphoria diagnoses, assessment, or clinical criteria. These recommendations include prescribing cross-sex hormones and puberty blockers to minors. The Government is concerned that such facially deficient care may be accompanied by facially deficient or misleading labelling.

36. The subpoena at issue here is one of several investigative tools the United States has been employing in its ongoing and legitimate investigation concerning the provision of medical sex trait modification services, including issues related to violations of the FDCA. The investigation has proceeded through multiple channels, including the analysis of insurance claims data, billing records, and other lawfully obtained material. Information developed through those efforts has raised questions concerning whether

14

puberty blockers and cross-sex hormones have been fraudulently distributed for unapproved uses involving RIH patients. For example, based on diagnosis codes, it appears that between 2020 and 2025, there were at least 4 minors first diagnosed at RIH with central precocious puberty at age 12 or older. This is well beyond the age at which children are typically diagnosed with precocious puberty. *See, e.g.*, Pediatric Endocrine Society, *Precocious Puberty: A Guide for Families,* https://pedsendo.org/patient-recourse/precocious-puberty (Apr. 29, 2026) ("Precocious puberty is usually defined as onset of puberty before age 8 in girls and before age 9 in boys.").

37. Moreover, claims analysis shows that between 2020 and 2025, the number of RIH patients with claims bearing a diagnosis code for gender dysphoria more than doubled; the number of claims for "endocrine disorder" experienced similar growth.

38. In addition, the director of RIH's pediatric "Gender and Sexuality Program" (and the principal author of the American Academy of Pediatrics' gender policy statement) was responsible for at least 14 insurance claims for RIH patients bearing an "endocrine disorder" diagnosis code over the last decade—indeed more than his claims bearing a "gender dysphoria" diagnosis code over the same period.

39. As part of this investigation, the United States has also reviewed medical records obtained from other pediatric hospitals that have treated gender dysphoria with sex trait modification services, including through the use of pharmaceuticals. Those medical records reflect multiple instances in which diagnostic or billing codes for medical conditions such as "endocrine disorder, unspecified" notwithstanding clinical notes that reflect that the true disorder being treated with the drugs is gender

15

dysphoria/transsexualism. Some records further reflect that certain speech or vocal interventions are coded as treatment for vocal disorders even where the purpose is voice femininization or masculinization. These observations form part of the ongoing and developing factual basis for the Government's continuing investigation of similarly situated treatment centers, such as RIH.

### THE SUBPOENA SPECIFICATIONS SEEK INFORMATION RELEVANT TO THE INVESTIGATION

40. The fifteen requests in the investigative HIPAA subpoena issued to RIH seek to further the investigation described above. The requests can be broadly broken down into four main categories: (1) requests related to personnel and corporate oversight (Request 1); (2) requests related to billing, coding, and reimbursement practices (Requests 2–6); (3) requests related to the practice's relationships with drug manufacturers, distributors, and pharmacies (Requests 7–10); and (4) requests regarding clinical practices and drug safety (Requests 11–15). All the subpoenaed records and documents are relevant to the federal healthcare investigation described herein. *See* 18 U.S.C. § 3486(a)(1).

41. Request 1 seeks information to identify who had authority to direct prescribing, billing, or marketing practices to determine liability. Under strict liability doctrines, including the responsible corporate officer doctrine, officers and responsible personnel can be held criminally liable for FDCA violations even without direct participation. Personnel files also show financial incentives, disciplinary history, and/or training which can establish knowledge and intent.

42. The requests in the second group (regarding billing, coding, and reimbursement practices) are necessary to determine whether the clinic disguised treatment for gender-

16

related mental disorders as another, physical illness (*e.g.*, endocrine disorder) to secure health benefit program reimbursement. Such practices are especially important to demonstrate an "intent to defraud or mislead" under 21 U.S.C. § 333(a)(2) if the clinic misrepresented the intended use of the drugs. Moreover, training materials and internal discussions can reveal whether improper coding was a deliberate strategy.

43.    The third group of requests (relating to relationships with drug manufacturers, distributors, and pharmacies) are probative of an intent to market or promote drugs for unapproved uses. If RIH, or one of its affiliated healthcare providers, received promotional materials, "scientific exchange information," or payments to encourage prescribing of puberty blockers or cross-sex hormones, such information would support a FDCA theory (including conspiracy) involving unlawful off-label promotion. Similarly, information regarding financial arrangements (consulting agreements, sponsorships, speaking honoraria) may suggest improper influence to reinforce a showing an intent to misbrand, including with intent to defraud or mislead.

44.    The final group of requests (relating to patient-level clinical practices and drug safety) will permit the United States to evaluate the scope of prescribing the drugs described herein (including the number and age range of patients treated), and consistency of diagnoses. It also establishes the scope of interstate distribution and the scale of potential FDCA violations. Linking each patient's clinical record to corresponding billing and insurance claims can demonstrate whether diagnoses were miscoded, which can prove fraudulent intent. Documentation of clinical justification, informed consent, and disclosure of off-label use is key to assessing whether the clinic

17

(and/or potential co-conspirators) concealed or downplayed risks associated with using these drugs in a manner not approved by FDA. Absence or minimization of such warnings could establish the intent to mislead. Patient charts also typically capture adverse outcomes, side effects, and complications of drug use. By reviewing multiple patient records, the investigative team may reveal systemic use of the same masking codes, fraudulent informed consent documents, etc. This enables investigators to distinguish between mere errors and an institutionalized practice. Finally, providing patient records can provide essential investigative leads. Parents may be witnesses about what disclosures were made. Patients (depending on age and circumstances) may provide information about the informed consent process, side effects, or other false or misleading information about the drugs conveyed during treatment. Health benefit programs tied to identified patients could provide additional information, including claim records, creating a triangulated evidentiary record. In sum, without this information, the Government cannot fully determine the scope of the violations, identify patterns of misbranding or fraudulent billing, or assess whether the conduct was undertaken with intent to defraud or mislead, as required for felony liability under 21 U.S.C. § 333(a)(2).

## GOVERNMENT INVESTIGATIVE RESOURCES

45. This is a bona fide, high-priority, and substantial investigation of potential FDCA violations in the provision of gender-related care for minors. Substantial government resources have been assigned to it. It is being handled by several veteran, career prosecutors with many decades of experience in healthcare fraud and FDCA enforcement between them, supported by a team of document analysts and other forensic

specialists. The Federal Bureau of Investigation ("FBI") has assigned agents and analysts to assist with various field activities and is employing advanced data analytics to identify prescribing patterns, potential unlawful off-label promotion, and patterns in reimbursement. In addition to FBI, FDA has also assigned agents from its Office of Criminal Investigations. The scope and coordination of these efforts reflect the seriousness with which the Government is pursuing potential violations of federal law.

## RIH'S FAILURE TO COMPLY WITH THE SUBPOENA

46.    The return date on the subpoena was Thursday, August 7, 2025. In early conversations with counsel for RIH, the Government communicated that it would be willing to receive documents responsive to the subpoena past the return date but that it did not expect to extend that grace period beyond reason. Counsel for RIH has communicated several times that it intends to and would be producing responsive documents. However, the last such communication was on February 4, 2026, and to date, RIH has produced only one document totaling six pages. In other words, RIH has failed to comply in any meaningful way with the subpoena.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 30th day of April, 2026.

LISA K. HSIAO
Acting Director
Enforcement & Affirmative Litigation Branch
Civil Division
United States Department of Justice

19

Exhibit B

# UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

—◆—

## SUBPOENA DUCES TECUM

No. 25-1431-032

**To:**   Rhode Island Hospital
593 Eddy Street
Providence, Rhode Island 02903

***YOU ARE HEREBY COMMANDED TO APPEAR BEFORE*** *Patrick Runkle, Ross Goldstein, and/or Francisco Unger, officials of the United States Department of Justice, and you are hereby required to bring with you and produce the following:*

Please see Attachment A

*which are necessary in the performance of the responsibility of the United States Department of Justice to investigate Federal health care offenses as defined in 18 U.S.C. § 24(a).*

*Please contact Assistant Director Patrick Runkle, Assistant Director Ross Goldstein, or Trial Attorney Francisco Unger at 202-616-0295 if you have any questions regarding this Subpoena Duces Tecum.*

### PLACE AND TIME FOR APPEARANCE:

United States Department of Justice, Consumer Protection Branch, 450 Fifth Street NW, Washington, DC
on Thursday, the 7th day of August, 2025, at ten o'clock a.m.

---

Failure to comply with the requirements of this subpoena will render you liable to proceedings in the district court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience.

---

Issued under authority of Section 248 of the Health Insurance Portability & Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. § 3486)

*IN TESTIMONY WHEREOF*

Brett A. Shumate, Assistant Attorney General, the undersigned official of the United States Department of Justice, has set his hand this 3rd day of July, 2025.



**BRETT SHUMATE**

Digitally signed by BRETT SHUMATE
Date: 2025.07.03 18:40:21 -04'00'

*(signature)*

## RETURN OF SERVICE

*I, being a person over 18 years of age, hereby certify that a copy of this subpoena was duly served on the person named herein by means of:*

1. *Personal delivery to an individual, to wit:*

_____
*(name)*

_____
*(title)*

_____
*(address)*

2. *Personal delivery to an address, to wit:*

_____
*(description of premises)*

_____
*(address)*

3. *Registered or certified mailing to:*

_____
*(name)*

_____
*(address)*

At _____ a.m. | p.m. on

_____
*(date)*

_____
*(signature)*

_____
*(title)*

## UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

## SUBPOENA DUCES TECUM

*Upon contumacy or refusal to obey, this subpoena shall be enforced by order of the appropriate United States District Court.*

# ATTACHMENT A TO SUBPOENA TO:

RHODE ISLAND HOSPITAL
593 EDDY STREET
PROVIDENCE, RHODE ISLAND 02903

## I. DEFINITIONS

1. "You," "Your Company," and "the Company," means:

   a. Rhode Island Hospital, a Rhode Island nonprofit corporation, whose principal place of business is located at 593 Eddy Street, Providence, Rhode Island, without regard to any name under which it has done business;

   b. All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part, including but not limited to Hasbro Children's Hospital Gender and Sexual Health Program; and

   c. Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority.

2. "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3. "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

   a. All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

   b. Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes, telegrams, messages, studies, analyses, books,

1

articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c. Electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), including metadata;

d. Any electronic files saved as a backup, including metadata;

e. Any deleted but recoverable electronic files, including metadata;

f. Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g. Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h. All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4. "Relevant Time Period" means January 1, 2020, through the present date. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5. "Or" as well as "and" shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6. "Any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

7. "Relate to" means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

8. "Communication" means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual

2

meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any records or logs reflecting the time, date, participants, and content of such communications.

9.  "Gender-related care" means any medical, surgical, psychological, or social treatment provided to individuals to alter their physical appearance or social presentation to resemble characteristics typically associated with the opposite biological sex.

10.  "Puberty blockers" means any gonadotropin-releasing hormone ("GnRH") agonists or related drugs (*e.g.,* leuprolide, triptorelin) used to delay the onset of puberty.

11.  "Hormones" includes testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as "gender affirming hormone therapy" ("GAHT") or transgender hormone therapy used to induce cross-sex characteristics.

12.  "Minor" means any patient under the age of 18 at the time of consultation, treatment, or prescription.

## II. GENERAL INSTRUCTIONS

1.  You are required to produce the **originals** of each document and other item that is responsive, in whole or in part, to any request set forth in this Subpoena, together with all copies of any such document that exist.

    a.  If a copy is identical to the original, you are not required to produce it, but if you choose not to, your records custodian (the "Custodian," as described below) must maintain a written log identifying the location(s) where each identical copy of the original document was located, including all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers of where the document is located.

    b.  If a copy differs from the original by virtue of any addition, deletion, alteration, notation, or inscription on any part of the front or back of the document, the original and copy must each be produced.

2.  **No document called for by this subpoena shall be destroyed, modified, redacted, removed, or otherwise made inaccessible.** Documents called for by this Subpoena for which a claim of privilege is made, in compliance with the instruction below, shall be retained and protected.

3

3.  Your Company is to designate someone as the person responsible to produce documents on the Subpoena return date (the "Custodian").

a.  Such Custodian shall have personal, direct, and thorough knowledge of, and responsibility for, the search conducted by the Company for documents responsive to this Subpoena.

b.  The Custodian shall be prepared on the return date to submit to examination concerning the method and completeness of the Company's response, the exact location(s) within the Company's premises at which documents produced in response to the Subpoena were found, and other matters pertaining to the search.

c.  The Custodian shall further be prepared to provide a written log identifying the location(s) in which each produced document was located, indicating all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers, of where the document is located.

4.  The Company shall identify the paragraph and subparagraph of Section III of this Attachment to the Subpoena ("Documents to Be Produced") to which each document produced pursuant to this Subpoena is responsive.

5.  If the Company has knowledge of any document that would be responsive to this Subpoena, but has been lost, destroyed, or discarded, it shall identify the document to the extent possible, and provide an explanation of the loss, destruction or discarding, including identification of each person authorizing or having knowledge of the loss, destruction, or discarding.

6.  The singular form of a word shall be construed to include within its meaning the plural form of the word, and *vice versa*, and the use of any tense of any verb shall be considered to include all other tenses in a manner that gives this Subpoena the broadest reading.

7.  All electronically stored information must be collected using a forensically sound process. When the image file is produced, the Company must preserve the integrity of the electronic document's contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

8.  If the Company withholds any document on the ground of any claimed privilege, it shall provide a statement with respect to each document setting forth

a.  The name and title of the author (and if different, the preparer and signatory);

4

b.   The name(s) and title(s) of the individual(s) to whom the document was addressed;

c.   The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

d.   The date of the document;

e.   The number of pages;

f.   A brief description of the subject matter;

g.   A statement of the specific basis on which privilege is claimed; and

h.   The paragraph or subparagraph in Section III of this Attachment ("Documents to Be Produced") to which it is responsive.

## III. DOCUMENTS TO BE PRODUCED

1.   Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories: (a) executives, management employees, or board members with authority to direct any aspect of the Company's affairs; (b) employees, contractors, or affiliates who have authority to prescribe medications or perform medical evaluations; and (c) employees, contractors, or affiliates who are engaged in billing activities.

2.   All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving gender-related care.

3.   All documents that show or relate to any use of diagnosis codes for minors other than those specifically identifying transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, medication management, etc.).

4.   All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for treatment of gender dysphoria by using alternative diagnoses or alternative ICD codes.

5.     All communications with public or private health care benefit programs or plans regarding the use of ICD codes for gender-related care, including any inquiries, denials, or appeals related to claims for such care.

6.     Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for gender-related care, puberty blockers, or hormone therapy.

7.     All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in gender-related care for minors.

8.     All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for gender-related care or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

9.     All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for gender-related care or for the treatment of gender dysphoria, including so-called "scientific exchange" materials.

10.     All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

11.     Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.

12.     For each such patient identified in Subpoena specification 11, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.

13.     All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (*i.e.,* uses not approved by the United States Food and Drug Administration) and potential risks.

14.     All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety of puberty blockers or hormones used in the treatment of minor patients.

15.     All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to gender-related care.


## IV. FORM OF PRODUCTION

Documents responsive to this Subpoena should be produced in the format specified in the "Production Specifications," attached as ATTACHMENT B to this Subpoena.

**SUBPOENA ATTACHMENT B**

**Specifications for Production of ESI and Digitized ("Scanned") Images
("Production Specifications")**

**Collection of Electronically Stored Information (ESI)**

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

1.    **Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form. Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

2.    **Production Format of ESI and Imaged Hard Copy Documents**

Responsive ESI shall be produced in its unprocessed form (i.e., in its native format), without altering native electronic file formats and maintains the integrity of all source, custodian, application, embedded and metadata related thereto. The native electronic file formats provided shall be of a type and nature which is functionally useable by all parties. No alteration shall be made to file names or extensions for responsive native electronic files. If a producing party is converting native files to image files for its own purposes, the Government requests a copy of that image file along with production of the native file.

For ESI, a producing party may provide an image file without a native file only if the affected document requires a privilege redaction or other permitted redaction.. Except as outlined below in sections 5 – 21, the redacted document shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. Paper documents shall also be imaged pursuant to the requirements below.

All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

a.    **Image File Format:** All imaged documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

b.    When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT

Group IV (2D Compression). When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

    i.  All TIFF file names shall include the unique Bates number burned into the image. (See section 22, below, regarding Bates number instructions.)

    ii.  All TIFF image files shall be stored with the ".tif" extension.

    iii.  Images without corresponding extracted text shall be OCR'd using standard COTS products.

        1.  An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

    iv.  All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

    v.  No image folder shall contain more than 2,000 images.

c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

    REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
    REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
    REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
    REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
    REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.

2

- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| | |
|---|---|
| *Field Separator* | *¶ or Code 020* |
| *Text Qualifier* | *þ or Code 254* |
| *Newline* | *® or Code 174* |
| *Multi-value* | *; or Code 059* |
| *Nested values* | *\ or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:
   \\*CaseName*\\**LoadFiles**
   \\*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)

*July 2022*

\CaseName\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder) \CaseName\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

3.   **Required Metadata/Database Fields**

A "√" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | √ | √ | √ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | √ | √ | √ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | √ | √ | √ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | √ | √ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | √ | √ |
| AUTHOR | Creator of the document | Text | 500 | | | √ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | √ | √ | √ |

4

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

5

*July 2022*   .

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent.  Do not provide 00/00/0000. | Date | MM/DD/YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |

6

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |

7

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

4.    **Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

   a. De-duplication of exact hash copies shall only be permitted if the producing party can meet all the provisions of this section. If a producing party cannot comply with any requirement of this section, it shall not conduct de-duplication of exact hash copies.

   b. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.

   c. All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

   d. All files should be globally de-duplicated with the following conditions:

8

*July 2022*

    i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

    ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

    iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

    iv. No customization of hashing may occur without prior express approval by the Government.

    v. De-duplication must be done by document family, not by individual document.

    vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be expressly stated in the cover letter accompanying the subsequent production(s).

e. The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

## 5.    Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

## 6.    Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

9

*July 2022*

7.  **Image-Only Files**

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

8.  **Encrypted Files**

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

    a.  The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.

    b.  If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

9.  **Production of Imaged Hard Copy Records**

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

    a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).

    b.  The first document in the collection represents the parent document and all other documents will represent the children.

    c.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

    d.  All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

10.  **Production of Spreadsheets and Presentation Files**

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below.

10

*July 2022*

The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

### 11.    Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

### 12.    Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies. These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

11

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

12

*July 2022*

| Field Name | Field Description | Mobile | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Mobile Cellebrite Categories** | | | | | | | | |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

13

Case 4:26-mc-00006-O   Document 1-2   Filed 04/30/26   Page 24 of 28   PageID 57

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

14

*July 2022*

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

15

### 17. Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18. Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format. The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19. Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production. The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#. The parties shall meet and confer regarding any required audio file redactions.

### 20. Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21. Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government. The following are examples:

a. AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.

b. GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

16

*July 2022*

    c.  Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

**22.    Bates Number Convention**

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|  | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

**23.    Media Formats for Storage and Delivery of Production Data**

Electronic documents and data shall be delivered on any of the following media:

    a.  CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
    b.  External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
    c.  Government approved File Transfer Protocol (FTP) technologies.
    d.  Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
    e.  Media should be labeled with the case name, production date, Bates range, and producing party.

**24.    Virus Protection and Security for Delivery of Production Data**

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

17

*July 2022*

25.    **Privilege Logs**

a.    The name and title of the author (and if different, the preparer and signatory);
b.    The name(s) and title(s) of the individual(s) to whom the document was addressed;
c.    The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
d.    The date of the document;
e.    The number of pages;
f.    A brief description of the subject matter;
g.    A statement of the specific basis on which privilege is claimed; and
h.    The paragraph or subparagraph of the Subpoena to which it is responsive.


26.    **Compliance and Adherence to Generally Accepted Technical Standards**

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

27.    **Read Me Text File**

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

28.    **Exception Report**

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

29.    **Transmittal Letter to Accompany Deliverables**

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.


-XXX-


18

Exhibit C

| From: | Friedemann, Glenn R |
|---|---|
| To: | Goldstein, Ross |
| Cc: | Runkle, Patrick; Dahlquist, Scott B.; Johnson, Tiara A |
| Subject: | [EXTERNAL] Re: Rhode Island Hospital Subpoena |
| Date: | Wednesday, July 9, 2025 5:06:45 PM |
| Attachments: | image001.png |
| | Image.png |

Thanks Ross. Received and acknowledged. Will review and be in touch.

Glenn

Glenn R. Friedemann | Associate General Counsel | Office of General Counsel | Brown University Health | 167 Point Street, Suite 200 | Providence, RI 02903 | Phone 401.444.6627 | Fax 401.444.6206 | Email – gfriedemann@brownhealth.org



From: Goldstein, Ross <Ross.Goldstein@usdoj.gov>
Sent: Wednesday, July 9, 2025 3:01 PM
To: Friedemann, Glenn R <gfriedemann@brownhealth.org>
Cc: Runkle, Patrick <Patrick.R.Runkle@usdoj.gov>; Dahlquist, Scott B. <Scott.B.Dahlquist@usdoj.gov>; Johnson, Tiara A <Tiara.A.Johnson@usdoj.gov>
Subject: Rhode Island Hospital Subpoena

WARNING: This email originated outside of Brown University Health and our authorized business partners. USE CAUTION when clicking on links or attachments.

Glenn,

Thanks for the call just now and for agreeing to accept service by email. As discussed, attached is the administrative subpoena we discussed. Kindly confirm receipt and acceptance of service by return email. If you have any questions or concerns, please do not hesitate to reach out.

Regards,



**Ross S. Goldstein | Assistant Director**
United States Department of Justice
Consumer Protection Branch
450 Fifth Street, NW #6400
Washington, D.C. 20001

Tel:  (202) 353-4218
Fax: (202) 514-8742
ross.goldstein@usdoj.gov

This transmission is intended only for the addressee(s) listed above and may contain information that is confidential. If you are not the addressee, any use, disclosure, copying or communication of the contents of this message is prohibited. Please contact me if this message was transmitted in error.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

IN THE MATTER OF
ADMINISTRATIVE SUBPOENA                              NO.
25-1431-032

## ORDER

Before the Court is the government's petition to enforce compliance with the above-captioned subpoena. The Court finds that the subpoena was issued within the Department of Justice's statutory authority, the subpoena seeks documents reasonably relevant to the investigation, and the subpoena's demands are reasonable. The Court further finds that the witness, Rhode Island Hospital, was served with the subpoena on July 3, 2025, and has failed to fully comply with the subpoena by providing records to the government on or before the original due date of August 7, 2025, or the date of the Government's filing of its petition to enforce of April 30, 2026. The Court further finds that the witness has neither filed a motion to quash nor shown just cause for noncompliance. The Court determines that the government's petition to enforce should be and is hereby **GRANTED**.

Therefore, the Court hereby **ORDERS** the following:

1.      That the witness, Rhode Island Hospital, provide all records responsive to each request in the subpoena within 14 days of the entry of this order; and

2.      That failure to fully comply with the subpoena or show just cause for continued noncompliance may result in sanctions up to and including this Court holding the witness in contempt.

Order | Page 1

Signed and entered this _____ day of _____ 2026.


_____
UNITED STATES DISTRICT JUDGE

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |  |
|---|---|---|
| **IN THE MATTER OF ADMINISTRATIVE SUBPOENA 25-1431-032** | § § § § § § § § § | **Civil Action No.  4:26-MC-00006-O** |

## <u>ORDER</u>

Before the Court is the government's petition to enforce compliance with the above captioned subpoena (ECF No. 1). The Court finds that the subpoena was issued within the Department of Justice's statutory authority, the subpoena seeks documents reasonably relevant to the investigation, and the subpoena's demands are reasonable. The Court further finds that the witness, Rhode Island Hospital, was served with the subpoena on July 3, 2025, and has failed to fully comply with the subpoena by providing records to the government on or before the original due date of August 7, 2025, or the date of the Government's filing of its petition to enforce of April 30, 2026. The Court further finds that the witness has neither filed a motion to quash nor shown just cause for noncompliance. The Court determines that the government's petition to enforce should be and is hereby **GRANTED.**

Therefore, the Court hereby **ORDERS** the following:

1.      That the witness, Rhode Island Hospital, provide all records responsive to each request in the subpoena within 14 days of the entry of this order; and

2.      That failure to fully comply with the subpoena or show just cause for continued noncompliance may result in sanctions up to and including this Court holding the witness in contempt.

**SO ORDERED** on this **30th day** of **April, 2026.**


_____
Reed O'Connor
**CHIEF UNITED STATES DISTRICT JUDGE**

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| IN THE MATTER OF ADMINISTRATIVE SUBPOENA 25-1431-032 | Civil Action No. 4:26-MC-0006-O |

**NOTICE OF APPEAL**

Notice is hereby given that Rhode Island Hospital appeals to the United States Court of Appeals for the Fifth Circuit from the Order entered in this action on April 30, 2026 (ECF No. 2).

Dated: May 6, 2026

Respectfully submitted,

*/s/ Mindy M. Sauter*
Mindy M. Sauter
Texas Bar No. 24033114
McGUIREWOODS LLP
2601 Olive Street
Suite 2100
Dallas, Texas 75201
T: (469) 372-3916
F: (214) 273-7470
msauter@mcguirewoods.com

Eric G. Olshan (*Pro Hac Vice* pending)
McGUIREWOODS LLP
Tower Two-Sixty, 260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
T: (412) 667-6000
F: (412) 667-6050
eolshan@mcguirewoods.com

Kathryn M. Barber (*Pro Hac Vice* pending)
McGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219

T: (804) 775-1227
F: (804) 698-2227
kbarber@mcguirewoods.com

*Attorneys for Rhode Island Hospital*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Notice of Appeal was filed electronically with the clerk of court via ECF, which will provide electronic service on all counsel of record.

Dated: May 6, 2026                          */s/ Mindy M. Sauter*
                                             Mindy M. Sauter

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

<table>
<tr><td>IN THE MATTER OF<br>ADMINISTRATIVE SUBPOENA 25-<br>1431-032</td><td>Civil Action No. 4:26-MC-0006-O</td></tr>
</table>

**EMERGENCY MOTION FOR STAY PENDING APPEAL**

Rhode Island Hospital moves the Court for a stay pending appeal of its April 30, 2026, Order enforcing the above-captioned administrative subpoena. RIH requests that this Court rule on its motion for a stay pending appeal by **Friday, May 8, 2026, at 12:00 p.m.** Counsel for RIH conferred with counsel for the Government, who stated that the Government opposes the requested relief.

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION .........................................................................................................................1

BACKGROUND ............................................................................................................................1

LEGAL STANDARD ....................................................................................................................3

ARGUMENT .................................................................................................................................4

I.      Rhode Island Hospital is likely to succeed on the merits .....................................4

        A.      The Court erroneously denied Rhode Island Hospital an opportunity to
                respond to the petition...............................................................................4

        B.      Venue is improper in this District ..............................................................6

        C.      The subpoena is unlawful ..........................................................................8

II.     Rhode Island Hospital will suffer irreparable harm without a stay ...................12

III.    The public interest and balance of equities favor a stay .....................................14

CONCLUSION.............................................................................................................................15

CERTIFICATE OF CONFERENCE ..........................................................................................16

CERTIFICATE OF SERVICE ....................................................................................................17

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re 2025 UPMC Subpoena,*
  No. 25-mc-1069, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025) ...........................................11

*In re Administrative Subpoena No. 25-1431-019,*
  800 F. Supp. 3d 229 (D. Mass. 2025) .....................................................................................11

*In re Anthony Marano Co.,*
  51 F.4th 722 (7th Cir. 2022) .....................................................................................................5

*Ass'n of Am. Physicians & Surgeons v. FDA,*
  13 F.4th 531 (6th Cir. 2021) ...................................................................................................10

*Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.,*
  97 F.3d 822 (5th Cir. 1996) .......................................................................................................7

*Book People, Inc. v. Wong,*
  91 F.4th 318 (5th Cir. 2024) ...................................................................................................12

*Castille v. Port Arthur ISD,*
  168 F.4th 240 (5th Cir. 2026) ...................................................................................................4

*In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.,*
  915 F.3d 1 (1st Cir. 2019) .........................................................................................................9

*In re Child.'s Nat'l Hosp.,*
  No. 25-cv-3780, 2026 WL 160792 (D. Md. Jan. 21, 2026) ..............................................11, 12

*Cleveland Bd. of Educ. v. Loudermill,*
  470 U.S. 532 (1985) ...................................................................................................................4

*Cobbledick v. United States,*
  309 U.S. 323 (1940) ...................................................................................................................3

*Conger v. Danek Med., Inc.,*
  27 F. Supp. 2d 717 (N.D. Tex. 1998) .......................................................................................9

*FEC v. Comm. to Elect Lyndon La Rouche,*
  613 F.2d 849 (D.C. Cir. 1979) ..................................................................................................8

*First Choice Women's Res. Ctrs., Inc. v. Davenport,*
  No. 24-781, slip. op. (U.S. Apr. 29, 2026) ......................................................................5, 13, 14

ii

*FTC v. Jim Walter Corp.*,
   651 F.2d 251 (5th Cir. 1981) .................................................................................................7, 8

*Garcia v. Posada*,
   No. 24-cv-360, 2024 WL 4415280 (N.D. Tex. Apr. 9, 2024) ....................................................15

*Harbor Healthcare Sys., L.P. v. United States*,
   5 F.4th 593 (5th Cir. 2021) .......................................................................................................13

*Nken v. Holder*,
   559 U.S. 418 (2009).............................................................................................................3, 14

*NLRB v. Cooper Tire & Robber Co.*,
   438 F.3d 1198 (D.C. Cir. 2006) .................................................................................................7

*NLRB v. Line*,
   50 F.3d 311 (5th Cir. 1995) .......................................................................................................7

*Okla. Press Pub. Co. v. Walling*,
   327 U.S. 186 (1946)...................................................................................................................5

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
   807 F. Supp. 3d 1295 (W.D. Wash. 2025)................................................................................11

*Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*,
   119 F.3d 935 (11th Cir. 1997) ...................................................................................................7

*Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Bd.*,
   878 F.2d 875, 881 (5th Cir. 1989) .........................................................................................4, 6

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
   678 F.3d 235 (3d Cir. 2012)......................................................................................................9

*Shotkin v. Nelson*,
   146 F.2d 402 (10th Cir. 1944) ...................................................................................................5

*In re Subpoena Duces Tecum No. 25-1431-016*,
   No. 25-mc-41, 2025 WL 3562151 (W.D. Wash. Sept. 3, 2025) ..............................................11

*In re Subpoena No. 25-1431-014*,
   810 F. Supp. 3d 555 (E.D. Pa. 2025) .................................................................................. 9-12

*Tex. Keystone, Inc. v. Prime Nat. Res., Inc.*,
   694 F.3d 548, 549, 552, 556 n.5 (5th Cir. 2012) ................................................................. 4-6

*United States v. Sturm, Ruger & Co., Inc.*,
   84 F.3d 1 (1st Cir. 1996)............................................................................................................5

iii

*United States v. Transocean Deepwater Drilling, Inc.*,
    767 F.3d 485 (5th Cir. 2014) ..................................................................5, 6, 8

*Veasy v. Perry*,
    769 F.3d 890 (5th Cir. 2014) ...............................................................................3

*Wash. Legal Found. v. Henney*,
    202 F.3d 331 (D.C. Cir. 2000) ............................................................................9

**Statutes**

18 U.S.C. § 3486 ..........................................................................................................1

18 U.S.C. § 3486(a)(1)(A)(i)(I) ...................................................................................8

18 U.S.C. § 3486(a)(1)(B)(i) .......................................................................................8

18 U.S.C. § 3486(c) .....................................................................................................6

21 U.S.C. § 331 ..........................................................................................................10

21 U.S.C. § 333(a)(1) .................................................................................................10

21 U.S.C. § 352(f) ........................................................................................................9

21 U.S.C. § 396 ............................................................................................................9

28 U.S.C. § 1291 ..........................................................................................................3

**Other Authorities**

21 C.F.R. § 201.128 .....................................................................................................8

21 C.F.R. § 202.1(*l*)(2) ..............................................................................................10

*Understanding Unapproved Use of Approved Drugs "Off Label,"* U.S. Food &
Drug Admin. (Feb. 5, 2018), https://www.fda.gov/patients/learn-about-expanded-
access-and-other-treatment-options/understanding-unapproved-use-approved-
drugs-label.................................................................................................................9

iv

**INTRODUCTION**

Last Thursday evening, without any notice to Rhode Island Hospital, the Government petitioned this Court to enforce a ten-month-old administrative subpoena. That same day, without giving RIH any opportunity to respond, this Court entered an Order enforcing the subpoena and giving RIH only 14 days to comply. That Order is legally and procedurally unsound. RIH has promptly appealed it. Given that RIH is likely to succeed on appeal and will suffer irreparable harm if the Order is enforced in the meantime, this Court should stay its Order for the duration of the appeal.

**BACKGROUND**

On July 9, 2025, the Department of Justice served an administrative subpoena on RIH at its principal place of business in Providence, Rhode Island. *See* Pet. Ex. B, ECF No. 1-2, at 2, 4;[1] Pet. Ex. C, ECF No. 1-3, at 2 (proof of service).[2] The Government set a return date of August 7 and requested production at the office of the DOJ's Consumer Protection Branch (now the Enforcement and Affirmative Litigation Branch), which is located in Washington, D.C. ECF No. 1-2 at 2. The Government purported to issue the subpoena under the Health Insurance Portability and Accountability Act (HIPAA), 18 U.S.C. § 3486, to "investigate Federal health care offenses." ECF No. 1-2 at 2.

The subpoena contains fifteen requests for documents, including three that explicitly call for sensitive patient information:

---

[1] Citations to public record pages are to the page numbers that appear in the header generated by the Court's ECF system.

[2] The Court's Order mistakenly states that service occurred on July 3, 2025. *See* Order, ECF No. 2, at 1. The Government's petition mistakenly (and contradictorily) states that service occurred on July 3, 2025, and on July 11, 2025. *See* Pet., ECF No. 1, at 1, 4. The Government's own exhibit reflects that service occurred on July 9, 2025. *See* ECF No. 1-3 at 2.

11.  Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.

12.  For each such patient identified in Subpoena specification 11, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.

13.  All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (*i.e.*, uses not approved by the United States Food and Drug Administration) and potential risks.

*Id.* at 9.

Following service of the subpoena, counsel for RIH and the Government began to discuss RIH's compliance efforts. Ex. 1 at App. 6, ¶ 8 ; *see* Declaration of Lisa K. Hsiao ("Hsiao Decl."), ECF No. 1-1, at 20, ¶ 46. Counsel for the Government informed Glenn Friedemann, Associate General Counsel for Brown Health (the parent organization of RIH), that the Government did not believe that RIH had engaged in any criminal wrongdoing. Ex. 1 at App. 6, ¶ 8. The Government also "communicated that it would be willing to receive documents responsive to the subpoena past the return date." Hsiao Decl. at 20, ¶ 46.

On January 29, 2026, RIH, through undersigned counsel Eric Olshan, notified the Government that it was prepared to produce additional responsive documents in the weeks to come, and that it would first send the Government proposed search terms for review. *See* Ex. 2 at App. 10. RIH sent the Government the proposed search terms on February 4, 2026. *See id.* RIH anticipated making a production upon the Government's confirmation of the search terms, but the Government did not respond, even to confirm receipt. *See id.*

RIH did not hear from the Government again until April 28, requesting that counsel "conference this week regarding status." *Id.* Although counsel for RIH responded the next day,

2

the next communication RIH received from the Government was not about scheduling; rather, it was an email sent after the close of business at 6:10 p.m. Eastern Time on Thursday, April 30, informing RIH that the Government had filed a petition to enforce the subpoena in this Court. *Id.* at 9. The Government did not confer with RIH in advance of the filing of the petition.

The Court granted the petition the same day it was filed and executed the Government's proposed order, requiring that RIH "provide all records responsive to each request in the subpoena within 14 days of the entry of this order"—by May 14, 2026—and stating that "failure to fully comply with the subpoena or show just cause for continued noncompliance may result in sanctions up to and including this Court holding [RIH] in contempt." *See* Order, ECF No. 2, at 1-2. RIH received no opportunity to respond to the petition.

The Court's Order enforcing the administrative subpoena is an appealable final judgment. *See Cobbledick v. United States*, 309 U.S. 323, 330 (1940); 28 U.S.C. § 1291. RIH seeks a stay of the Court's Order pending resolution of its appeal to the Fifth Circuit.

**LEGAL STANDARD**

In deciding whether to enter a stay pending appeal, courts consider "(1) whether the stay applicant has made a strong showing that he or she is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Veasy v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014) (quoting *Nken v. Holder*, 559 U.S. 418, 426 (2009)). "The first two factors of the traditional standard are the most critical." *Id.* (quoting *Nken*, 559 U.S. at 434).

**ARGUMENT**

This Court denied RIH due process and erroneously ordered enforcement of a legally improper subpoena. RIH is appealing this decision. While the appeal is pending, this Court should stay its Order. The Court's refusal to give RIH an opportunity to respond in opposition to the Government's petition is reversible error, and the subpoena is otherwise legally unsound. The remaining stay factors also support a stay.

**I.      Rhode Island Hospital is likely to succeed on the merits.**

RIH has multiple grounds for its appeal on which it is highly likely to succeed. Because the Court refused to allow adversarial testing of the Government's petition, the Fifth Circuit is likely to reverse. That error also meant that RIH had no chance to raise its other arguments against the subpoena's enforcement, which buttress its likely success on appeal.

**A.      The Court erroneously denied Rhode Island Hospital an opportunity to respond to the petition.**

This Court impermissibly denied RIH due process by issuing its Order without allowing RIH to be heard. Procedural due process requires that a recipient of an administrative subpoena have both "notice and an opportunity to respond" before enforcement. *Castille v. Port Arthur ISD*, 168 F.4th 240, 252 (5th Cir. 2026) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)). RIH received neither. It will thus prevail in its appeal.

The Fifth Circuit has repeatedly confirmed this due process requirement in administrative subpoena enforcement proceedings. In *Sandsend Financial Consultants, Ltd. v. Federal Home Loan Bank Board*, the Fifth Circuit held that, by ruling on a motion to quash an administrative subpoena before receiving a response, the district court "robb[ed]" the subpoena's issuer of "its right to be heard." 878 F.2d 875, 881 (5th Cir. 1989). And again, in *Texas Keystone, Inc. v. Prime Natural Resources, Inc.*, the Fifth Circuit held that the district court violated procedural due process

4

by granting a motion to quash the day after it was filed, without giving the issuer "an opportunity to respond in opposition."  694 F.3d 548, 549, 552, 556 n.5 (5th Cir. 2012).

This right to respond applies in proceedings to quash administrative subpoenas and to enforce them alike.  "An administrative subpoena is not self-executing"; enforcing one thus requires "judicial review and enforcement."  *United States v. Sturm, Ruger & Co., Inc.*, 84 F.3d 1, 3 (1st Cir. 1996).  Indeed, the "enforcement process for administrative subpoenas" is designed to give the "subpoenaed party . . . an opportunity to be heard during the enforcement proceeding itself."  *In re Anthony Marano Co.*, 51 F.4th 722, 734 (7th Cir. 2022).  More precisely, due process requires the opportunity to be heard *before* enforcement.  *See Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 195 (1946) (describing administrative subpoenas enforced "pursuant to orders of court authorized by law and made after adequate opportunity to present objections"); *Sturm*, 84 F.3d at 3 ("[T]he subject of an administrative subpoena has an opportunity to challenge the subpoena before yielding the information."); *Shotkin v. Nelson*, 146 F.2d 402, 405 (10th Cir. 1944) ("[T]he trial court should have given . . . notice and an opportunity to be heard before the enforcement order was issued.").

This right to respond is critical, not just to a participant's due process rights, but also to ensure adversarial "testing [of] the subpoena in federal court."  *First Choice Women's Res. Ctrs., Inc. v. Davenport*, No. 24-781, slip. op. at 18 (U.S. Apr. 29, 2026) (internal quotation marks omitted).  The standards for judicial enforcement of administrative subpoenas confirm the need for a fulsome adversarial process.  Again, these subpoenas are not self-enforcing—a court must decide whether to enforce one by evaluating whether "(1) the subpoena is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome."  *United States v. Transocean Deepwater*

*Drilling, Inc.*, 767 F.3d 485, 488 (5th Cir. 2014).  "The Government bears the initial burden to show that these criteria have been met," and "[o]nce the Government has made a prima facie case, *the burden of going forward shifts to the party opposing the subpoenas*."  *Id.* at 489 (emphasis added).  That burden-shifting cannot happen if the opposing party has no chance to respond.  Nor can a court adequately assess the controlling factors without hearing from both sides.

The Court's refusal to give RIH an opportunity to respond in opposition to the Government's petition is a procedural error that will result in reversal on appeal.  *See Tex. Keystone*, 694 F.3d at 555; *Sandsend*, 878 F.2d at 881 (explaining that this "procedural error[] . . . would be dispositive").

### B.    Venue is improper in this District.

The Court's Order is also erroneous because the Government improperly filed its petition in this District.  This Court is not the proper venue to adjudicate the Government's petition.  Title 18 U.S.C. § 3486(c) permits enforcement of an administrative subpoena in "any court of the United States within the jurisdiction of which the investigation is carried on or of which the subpoenaed person is an inhabitant, or in which he carries on business or may be found."  The Government's petition conclusorily asserts that the investigation "is being carried out in the Northern District of Texas."[3]  Pet., ECF No. 1, at 2.  The lack of evidentiary support for that assertion is fatal to the Government's enforcement effort in this District.

Neither the Government's petition nor its accompanying exhibits identify any nexus between its investigation and this District.  The administrative subpoena demanded production at the Consumer Protection Branch office in Washington, D.C.  ECF No. 1-2 at 1.  The DOJ officials

---

[3] The Government does not assert any other basis for venue, and RIH's principal place of business is in Rhode Island.  *See* ECF No. 1-2 at 4.

who have communicated with RIH about the subpoena have done so from that office in Washington, D.C.  *See* ECF No. 1-3 at 3; *see also* Pet. 13; Ex. 2 at App. 9-10.  The Government has not identified any target of the investigation based in the Northern District of Texas.  RIH itself has no ties there.  And the declaration of Lisa Hsiao, Acting Director of EALB, makes no mention of any investigative activities in the Northern District of Texas, as opposed to Washington D.C., where the EALB's office is located.  *See generally* Hsiao Decl.; *see also* Pet. 13; Ex. 3 at App. 12.

The record contains no support for the Government's claim that its investigation is being carried on in the Northern District of Texas, let alone that it is being carried out here "to any substantial degree."  *FTC v. Jim Walter Corp.*, 651 F.2d 251, 254 (5th Cir. 1981), *abrogated on other grounds as recognized by Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 943 (11th Cir. 1997).[4]  Nothing supports enforcement in a district with such a tenuous and unproven connection to the underlying investigation.[5]  Indeed, even when an investigation is "nationwide in scope," venue cannot be simply based on the Government's "choice of any forum it like[s]."  *NLRB v. Cooper Tire & Robber Co.*, 438 F.3d 1198, 1200, 1202 (D.C. Cir. 2006).  Venue then lies in the "*command center*" or "hub" of the investigation—here, the entirety of the investigative contact between RIH and the Government prior to the petition's filing makes clear that that would be the District of Columbia, not the Northern District of Texas.  *Id.* at 1202; *see*

---

[4] The Fifth Circuit has expressed "grave misgivings" regarding the assertion of personal jurisdiction over a party that lacks minimum contacts with the forum. *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 826 (5th Cir. 1996).  RIH's lack of contacts with the Northern District of Texas further shows that the Government's "choice of forum" is "unreasonable" for purposes of the venue analysis. *Jim Walter*, 651 F.2d at 254; *NLRB v. Cooper Tire & Robber Co.*, 438 F.3d 1198, 1202 (D.C. Cir. 2006) (also assessing reasonableness).

[5] *See NLRB v. Line*, 50 F.3d 311, 313-14 (5th Cir. 1995) (district where the underlying labor practices under investigation occurred); *Jim Walter*, 651 F.2d at 254 (district where "[m]any of the building and marketing practices under investigation" occurred and where the agency managed the investigation).

*FEC v. Comm. to Elect Lyndon La Rouche*, 613 F.2d 849, 857 (D.C. Cir. 1979); *see also Jim Walter*, 651 F.2d at 254 (considering where the agency "managed [its] investigation").

      **C.**      **The subpoena is unlawful.**

Even if venue were proper in this District, this Court should have denied the Government's petition.

To start, the subpoena lacks a congressionally authorized and legitimate investigatory purpose. *See Transocean*, 767 F.3d at 488-89. Through HIPAA, Congress delegated the authority to issue subpoenas in connection with an investigation of a "Federal health care offense." 18 U.S.C. § 3486(a)(1)(A)(i)(I). The Government's authority is limited to seeking items that are "relevant to the investigation" of such an offense. *Id.* § 3486(a)(1)(B)(i).

The Government bases the subpoena on its authority to investigate violations of the Food, Drug, and Cosmetic Act (FDCA). *See* Pet. 2. The Government's proffered theory of criminal FDCA liability is that "off-label use of puberty blockers and cross-sex hormones" is "a violation of the FDCA." *Id.* at 4. That theory is wrong.

The Government arrives at that liability theory through a series of convoluted steps that lack support in the FDCA's text. The Government asserts that a drug is "misbranded" if "its labeling does not bear adequate directions for its intended use." *Id.* at 2. The term "intended use" comes from a regulation of the Food and Drug Administration, which states that the "intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer." 21 C.F.R. § 201.128. The Government's apparent theory is that if a drug's "intended use" changes as it makes its way from manufacturer to patient—including even when a physician prescribes the drug for an "off-label use"—then the drug becomes "misbranded" in violation of the FDCA,

8

because its labeling will no longer match the "intended use" of the physician.  *See* Pet. 2, 4.  In this respect, the Government asserts, "off-label use" by physicians violates the FDCA.  *Id.* at 4.

The Government's theory is contrary to the statute and cannot stand.  The federal government lacks authority to regulate the practice of medicine, including a physician's off-label prescription of drugs, under the FDCA.  The FDCA's text explicitly confirms that.  *See* 21 U.S.C. § 396 ("Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.").  As is well recognized, the FDCA "regulates how manufacturers label medical devices and drugs"—not "the practice of medicine." *Conger v. Danek Med., Inc.*, 27 F. Supp. 2d 717, 720 (N.D. Tex. 1998).  "Physicians routinely use products for 'off-label' purposes," and "[s]uch off-label use is appropriate, rational, and accepted medical practice and can be of great value."  *Id.*; *see In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1, 5 (1st Cir. 2019); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 240 (3d Cir. 2012); *Wash. Legal Found. v. Henney*, 202 F.3d 331, 332-33 (D.C. Cir. 2000).[6]

Because physicians can lawfully prescribe drugs off-label, the concept of "intended use" (and misbranding predicated on intended use) is not applicable to physicians' treatment decisions.  Misbranding liability predicated on the lack of "adequate directions for use" attaches only to those who manufacture and distribute a drug.  21 U.S.C. § 352(f); *see In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 568 (E.D. Pa. 2025).  The FDCA thus ensures that manufacturers and distributors are accountable for drug labeling and the representations they make about drug

---

[6] *See also Understanding Unapproved Use of Approved Drugs "Off Label,"* U.S. Food & Drug Admin. (Feb. 5, 2018), https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label.

products placed into the stream of commerce.  But misbranding liability does not attach to physicians based on off-label prescribing.  *See Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 544 (6th Cir. 2021) ("The Act regulates drug distribution; it does not bar doctors from prescribing an approved drug (like hydroxychloroquine) for an off-label use (like COVID-19).").

The Government's theory would turn the FDCA on its head by imposing criminal liability based on off-label prescribing—a lawful practice.  The Government seeks to impose criminal liability on everyone up the supply chain from a doctor who engages in off-label prescribing (*e.g.*, drug manufacturers and distributors) based on the doctor's own lawful decision to prescribe a drug off-label.  And because the FDCA is a strict-liability statute that imposes criminal liability for misbranding "without any proof of criminal intent" or "direct participation," Pet. 3 (citing 21 U.S.C. §§ 331, 333(a)(1)); *id.* at 7, under the Government's reading of the statute, anyone in the supply chain or peripherally involved could be held criminally liable for a doctor's subsequent and lawful off-label prescription.  That theory badly misreads the FDCA and cannot support the Government's investigation into RIH or any other entity.

In short, the Government asserts sweeping authority to criminally punish anyone in the stream of distribution for "misbranding" solely based on whether a physician has intended to engage in the lawful practice of off-label prescribing.[7]  No such authority exists, and the Government therefore lacks statutory authority to investigate that lawful practice.

---

[7] In addition to targeting "manufacturers and distributors," the Government states without elaboration that it "seeks records to determine whether RI Hospital itself may have engaged in conduct that implicates the FDCA."  Pet. 6.  Under the FDA's own understanding of the Act, however, "misbranding" through false or misleading "labeling" occurs in materials "supplied by the manufacturer, packer, or distributor of the drug"—not the downstream provider.  *See* 21 C.F.R. § 202.1(*l*)(2); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 567, 586.  This position is also inconsistent with representations made by Government counsel to RIH.  Ex. 1 at App. 6, ¶ 8.

Given the faulty statutory basis on which the Government rests its investigation, district courts around the country have correctly held that the Government lacks authority to enforce identical subpoenas, and in turn has issued those subpoenas for an improper purpose. *See In re Child.'s Nat'l Hosp.*, No. 25-cv-3780, 2026 WL 160792, at *8 (D. Md. Jan. 21, 2026); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1302-03 (W.D. Wash. 2025), *appeal pending*, No. 25-7384 (9th Cir.); *In re Administrative Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 237-38 (D. Mass. 2025), *appeal pending*, No. 26-1093 (1st Cir.); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 25-mc-41, 2025 WL 3562151, at *8-12 (W.D. Wash. Sept. 3, 2025). RIH is likely to succeed in demonstrating the same.

RIH is also likely to succeed in showing that, as multiple courts have concluded, the subpoena is overly broad and burdensome. *See In re Child.'s Nat'l Hosp.*, 2026 WL 160792, at *8; *QueerDoc*, 807 F. Supp. 3d at 1304; *In re Administrative Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 238. Even if the Government were properly investigating potential FDCA violations (it is not), the subpoena overreaches with its intrusive request for patient records that include sensitive personally identifiable information (names, dates of birth, Social Security numbers, and home addresses), medical diagnoses, and other sensitive medical documents. *See* ECF No. 1-2 at 9-10 (requests 11-13).

These requests for patient records are not relevant to any inquiry into potential FDCA violations, even under the Government's untenable reading of the law. *See In re 2025 UPMC Subpoena*, No. 25-mc-1069, 2025 WL 3724705, at *3 (W.D. Pa. Dec. 24, 2025) (limiting subpoena to strike requests that pertain to patient records); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 578-81 (same). Concluding otherwise would again stretch the FDCA's text beyond recognition. The FDCA regulates "the introduction, labeling, and distribution of drugs in interstate

commerce; it does not govern how physicians diagnose patients, obtain consent, document treatment, or communicate" with patients. *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 579; *see In re Child.'s Nat'l Hosp.*, 2026 WL 160792, at *8.

In addition, contrary to the Government's assertion, producing these records "threatens to unduly disrupt or seriously hinder" RIH's operations. *Contra* Pet. 11 (citation omitted). The Government faults RIH for not "present[ing] to the Department any evidence demonstrating that compliance with the subpoena would cause such a disruption or hindrance." *Id.* But RIH does not have to present that evidence "to the Department"—the time and place to present such evidence would have been to *this Court*, in opposition to the petition for enforcement. The attached declarations detail the burden on RIH and its employees, including the threats that the ordered full production would pose to RIH patient relationships at the core of the hospital's operations. Ex. 1 at App. 6-7, ¶¶ 10-13; Ex. 4 at App. 15-16, ¶¶ 4-11; Ex. 5 at App. 20, ¶¶ 12-14.

In sum, RIH's appeal will raise multiple challenges to the subpoena's enforcement and is likely to succeed on the merits of those challenges. This factor weighs strongly in favor of a stay.

## II. Rhode Island Hospital will suffer irreparable harm without a stay.

The irreparable constitutional and monetary injuries RIH will suffer without a stay also support the requested relief.

For one, if RIH must comply with the subpoena with no opportunity to respond, this litigation will become moot without RIH ever receiving an opportunity to be heard. Its resulting deprivation of its due process right would constitute irreparable harm. *See Book People, Inc. v. Wong*, 91 F.4th 318, 340-41 (5th Cir. 2024).

Moreover, compliance with a subpoena later held unlawful produces irreparable monetary harm. *See id.* at 341. Any production will involve collecting information from disparate platforms

and then processing, de-duplicating, anonymizing, and reviewing these documents for privilege and confidentiality.  This process takes time and costs money—upwards of millions of dollars.  Ex. 1 at App. 6-7, ¶¶ 10-13.  Any such compliance will thus cause expenses that RIH can never recoup. *Id.* at 7, ¶ 13.

RIH will also suffer irreparable harm to its patient relationships without a stay.  Among other things, RIH will have to turn over highly sensitive medical records that contain comprehensive psychosocial evaluations and deeply personal disclosures by children about their bodies, sexuality, trauma, family dynamics, self-harm, mental-health history, and cognitive and emotional functioning.  Ex. 5 at 19, ¶¶ 6-8.

Patients rely on RIH to maintain the confidentiality of exactly this information.  *Id.* at 20, ¶ 11; Ex. 4 at 14-15, ¶¶ 5-6. But as the Supreme Court recently confirmed, disclosure pursuant to a subpoena produces real risks of that "information becoming public," even when the Government promises confidentiality (and even if a court enters a protective order).  *First Choice*, slip op. at 21.  The information "might wind up in the public domain due to a hack or leak," creating a "risk of harassment and reprisals" of RIH employees and patients.  *Id.*  Forced compliance thus threatens irreparable harm to those patients and, in turn, their relationships with their providers at RIH and RIH's overall operations.

Indeed, just as a subpoena "is enough to discourage reasonable individuals from associating," it can also discourage patients from consulting their medical providers and seeking the medical care they need.  *Id.*; *see* Ex. 4 at App. 15, ¶¶ 8-9; Ex. 5 at 20, ¶ 12.  Enforcement of this subpoena therefore risks irreparable harm to RIH's ability to provide sound medical treatment by intruding upon its private records.  *See Harbor Healthcare Sys., L.P. v. United States*, 5 F.4th

593, 600 (5th Cir. 2021) ("The government's ongoing intrusion on . . . privacy constitutes an irreparable injury."). This factor also warrants a stay.

III.    **The public interest and balance of equities favor a stay.**

Finally, the last two factors—the harm to the opposing party and the public interest—weigh heavily in favor of a stay. These two factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Any potential harm to the Government from a stay would be minimal. The Government allowed ten months to pass before seeking to enforce its subpoena without warning. Up to the filing of the enforcement petition, the Government communicated no objection to delayed production. The Government did not seek immediate or emergency relief in its petition and has identified no basis for urgency. Meanwhile, RIH will retain and protect responsive documents. Ex. 1 at App. 7, ¶ 14. As a result, the additional time needed to remedy the Court's due process violation and address the unlawful subpoena will not substantially prejudice the Government's investigation.

The privacy interests at stake further tip the balance of the equities away from the Government. *See First Choice*, slip op. at 21. The Government seeks vast swaths of private patient information untethered to its investigative authority. The Government's purported investigatory interest therefore cannot outweigh the harm to RIH and its patients.

In sum, all four stay factors strongly justify a stay.

14

**CONCLUSION**

For these reasons, the Court should stay the Court's April 30, 2026, order pending resolution of RIH's appeal to the Fifth Circuit.[8]

Dated: May 6, 2026

Respectfully submitted,

*/s/ Mindy M. Sauter*
Mindy M. Sauter
Texas Bar No. 24033114
MCGUIREWOODS LLP
2601 Olive Street
Suite 2100
Dallas, Texas 75201
T: (469) 372-3916
F: (214) 273-7470
msauter@mcguirewoods.com

Eric G. Olshan (*Pro Hac Vice* pending)
MCGUIREWOODS LLP
Tower Two-Sixty, 260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
T: (412) 667-6000
F: (412) 667-6050
eolshan@mcguirewoods.com

Kathryn M. Barber (*Pro Hac Vice* pending)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T: (804) 775-1227
F: (804) 698-2227
kbarber@mcguirewoods.com

*Attorneys for Rhode Island Hospital*

---

[8] Should the Court decline to enter a full stay pending appeal, RIH requests that the Court enter a temporary administrative stay pending the Fifth Circuit's decision on RIH's motion for a stay pending appeal, which RIH will file in the Fifth Circuit if this Court denies the requested stay. *See Garcia v. Posada*, No. 24-cv-360, 2024 WL 4415280, at *1 (N.D. Tex. Apr. 9, 2024) (entering an administrative stay of one week to permit sufficient time for review on appeal).

15

## CERTIFICATE OF CONFERENCE

On May 3 and May 4, 2026, counsel for Rhode Island Hospital, Eric Olshan, corresponded by email with counsel of record for the Government (Ross Goldstein, Patrick Runkle, Scott Dahlquist, and Ethan Womble) regarding this Motion for Stay Pending Appeal. The Government does not consent to the requested relief, and the parties therefore could not reach agreement. Accordingly, pursuant to Local Rule 7.1(b), the undersigned states that this motion is opposed.

Dated: May 6, 2026

Respectfully submitted,

*/s/ Mindy M. Sauter*
Mindy M. Sauter
Texas Bar No. 24033114
MCGUIREWOODS LLP
2601 Olive Street
Suite 2100
Dallas, Texas 75201
T: (469) 372-3916
F: (214) 273-7470
msauter@mcguirewoods.com

Eric G. Olshan (*Pro Hac Vice* pending)
MCGUIREWOODS LLP
Tower Two-Sixty, 260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
T: (412) 667-6000
F: (412) 667-6050
eolshan@mcguirewoods.com

Kathryn M. Barber (*Pro Hac Vice* pending)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T: (804) 775-1227
F: (804) 698-2227
kbarber@mcguirewoods.com

*Attorneys for Rhode Island Hospital*

16

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing Emergency

Motion for Stay Pending Appeal was filed electronically with the clerk of court via ECF, which

will provide electronic service on all counsel of record.


Dated: May 6, 2026                                     Respectfully submitted,

                                                      /s/ Mindy M. Sauter
                                                      Mindy M. Sauter
                                                      Texas Bar No. 24033114
                                                      MCGUIREWOODS LLP
                                                      2601 Olive Street
                                                      Suite 2100
                                                      Dallas, Texas 75201
                                                      T: (469) 372-3916
                                                      F: (214) 273-7470
                                                      msauter@mcguirewoods.com

                                                      Eric G. Olshan (*Pro Hac Vice* pending)
                                                      MCGUIREWOODS LLP
                                                      Tower Two-Sixty, 260 Forbes Avenue
                                                      Suite 1800
                                                      Pittsburgh, PA 15222
                                                      T: (412) 667-6000
                                                      F: (412) 667-6050
                                                      eolshan@mcguirewoods.com

                                                      Kathryn M. Barber (*Pro Hac Vice* pending)
                                                      MCGUIREWOODS LLP
                                                      800 East Canal Street
                                                      Richmond, VA 23219
                                                      T: (804) 775-1227
                                                      F: (804) 698-2227
                                                      kbarber@mcguirewoods.com

                                                      *Attorneys for Rhode Island Hospital*

17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

IN THE MATTER OF
ADMINISTRATIVE SUBPOENA 25-
1431-032

Civil Action No. 4:26-MC-0006-O

**[PROPOSED] ORDER**

Before this Court is Rhode Island Hospital's Emergency Motion for Stay Pending Appeal

(ECF No. 7).  Upon consideration of the Motion, the Court determines that Rhode Island Hospital's

Emergency Motion for Stay Pending Appeal should be and is **GRANTED.**

Therefore, the Court **ORDERS** that its Order dated April 30, 2026 (ECF No. 2) is

**STAYED** pending resolution of the appeal.

**SO ORDERED** on this ___ day of May, 2026.

_____
**Reed O'Connor**
**UNITED STATES CHIEF DISTRICT JUDGE**

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| IN THE MATTER OF ADMINISTRATIVE SUBPOENA 25-1431-032 | Civil Action No. 4:26-MC-0006-O |

**APPENDIX IN SUPPORT OF EMERGENCY MOTION FOR STAY PENDING APPEAL**

| Exhibit No. | Description | Appendix No. |
|---|---|---|
| 1 | Declaration of Glenn R. Friedemann, Esq. | App. 4 – App. 7 |
| 2 | Email Exchange Related to Administrative Subpoena | App. 8 – App. 10 |
| 3 | Location of Enforcement & Affirmative Litigation Branch Office | App. 11 – App. 12 |
| 4 | Declaration of Dr. Phyllis Dennery, M.D. | App. 13 – App. 16 |
| 5 | Declaration of Dr. Abigail Donaldson, M.D. | App. 17 – App 21 |

Dated: May 6, 2026

Respectfully submitted,

*/s/ Mindy M. Sauter*
Mindy M. Sauter
Texas Bar No. 24033114
MCGUIREWOODS LLP
2601 Olive Street
Suite 2100
Dallas, Texas 75201
T: (469) 372-3916
F: (214) 273-7470
msauter@mcguirewoods.com

Eric G. Olshan (*Pro Hac Vice* pending)
MCGUIREWOODS LLP
Tower Two-Sixty, 260 Forbes Avenue
Suite 1800

App. 1

Pittsburgh, PA 15222
T: (412) 667-6000
F: (412) 667-6050
eolshan@mcguirewoods.com

Kathryn M. Barber (*Pro Hac Vice* pending)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T: (804) 775-1227
F: (804) 698-2227
kbarber@mcguirewoods.com

App. 2

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the Appendix in Support of Emergency Motion for Stay Pending Appeal was filed electronically with the clerk of court via ECF, which will provide electronic service on all counsel of record.

Dated: May 6, 2026                              */s/ Mindy M. Sauter*
                                                Mindy M. Sauter

App. 3

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

IN THE MATTER OF
ADMINISTRATIVE SUBPOENA 25-
1431-032

Civil Action No. 4:26-MC-0006-O

**DECLARATION OF GLENN R. FRIEDEMANN, ESQ.**

I, Glenn R. Friedemann, declare as follows:

1.      I am the Associate General Counsel in the Office of the General Counsel for Brown University Health ("Brown Health"). I have been in this role for 20 years. In this role, I have supervised matters related to the Health Insurance Portability and Accountability Act Subpoena No. 25-1431-032 ("the Subpoena") issued to Rhode Island Hospital ("RIH").

2.      Brown Health is a not-for-profit health system based in Providence, Rhode Island. Brown Health is organized as a Rhode Island nonprofit corporation (IRS 501(c)(3)) and has been domiciled in the state of Rhode Island since its formation. Brown Health is the parent organization of RIH.

3.      Brown Health's corporate offices are located at 15 Lasalle Sq., Providence, Rhode Island, 02903.

4.      RIH's principal place of business is 593 Eddy Street, Providence, RI 02903. The vast majority of RIH's hospitals, clinics, and patient care sites are located in Rhode Island. RIH has two community hospital affiliates that operate in Fall River, Massachusetts, and Taunton, Massachusetts.

5.    All of Brown Health's and RIH's corporate functions—such as legal, communications, human resources, and finance operations—are carried out from Providence, Rhode Island.

6.    RIH provides gender-affirming care through the Gender and Sexuality Program at Hasbro Children's Hospital, which is the pediatric division of RIH.  Hasbro Children's Hospital primary place of business is 593 Eddy St, Providence, RI 02903.

7.    On July 9, 2025, RIH was served with the Subpoena by the Department of Justice. The Subpoena included request for production with a return date of August 7, 2025, at the Department of Justice's office in Washington, D.C.

8.    On July 9, 2025, counsel for the Government contacted me by phone about the Subpoena.  On that call, counsel for the Government informed me that it did not believe that RIH had engaged in any criminal wrongdoing.

9.    The Court's April 30, 2026, Order requires compliance with the Subpoena within a 14-day period, by May 14, 2026.

10.    Full compliance with the Subpoena by May 14 is not possible.  The data is not hosted in a manner that can be easily collected or reviewed.  The data must be collected from disparate platforms (including legacy platforms) and hard copy sources, processed, de-duplicated, and reviewed for privilege and confidentiality.  This process alone will take several months.

11.    Moreover, many of the custodians whose documents are required are actively practicing medical providers who care for patients daily.  Every hour they spend identifying documents, reviewing materials, meeting with counsel, and engaging in other activities necessary to comply with the Subpoena detracts from their ability to administer patient care.

12.     Finally, to protect its patients' privacy, RIH is exploring ways in which it can anonymize its patient records before any production.  The Department of Justice has agreed to accept anonymized patient records in other litigation involving similar subpoenas.  However, the process of anonymization is burdensome and will take several months to complete.

13.     Accordingly, full compliance with the Subpoena will carry an irreparable monetary harm of millions of dollars that RIH will be unable to recover if the Subpoena is found invalid.

14.     RIH will retain and protect all responsive materials pending a determination in this matter.

15.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  MAY 6, 2026

/s/ _Glenn R. Friedemann_

Glenn R. Friedemann, Esq.

App. 7

# EXHIBIT 2

| From: | Gunn, David L (CRM) |
|---|---|
| To: | Narver, Clint |
| Cc: | Olshan, Eric G.; Shahane, Rhea T.; Dahlquist, Scott B (CIV); Campbell, Jordan C (CIV); Goldstein, Ross (CRM); Runkle, Patrick; Scott, Steven R (CRM) |
| Subject: | RE: Rhode Island Hospital / Production of Search Terms |
| Date: | Thursday, April 30, 2026 6:10:21 PM |
| Attachments: | 2026.04.30 - Rhode Island - USA Petition for Enforcement (FILED).pdf |
| | 2026.04.30 - Rhode Island - Ex. A.pdf |
| | 2026.04.30 - Rhode Island - Ex. B.pdf |
| | 2026.04.30 - Rhode Island - Ex. C.pdf |
| | 2026.04.30 - Rhode Island - Proposed Order.pdf |

**EXTERNAL EMAIL; use caution with links and attachments**

Clint,

No immediate need to connect now.  I had hoped to talk before we filed the attached.  I'm sure we will discuss soon.

Best,
David

---

**From:** Narver, Clint <cnarver@mcguirewoods.com>
**Sent:** Wednesday, April 29, 2026 5:11 PM
**To:** Gunn, David L (CRM) <David.L.Gunn@usdoj.gov>; Dahlquist, Scott (CIV) <Scott.Dahlquist2@usdoj.gov>
**Cc:** Olshan, Eric G. <eolshan@mcguirewoods.com>; Shahane, Rhea T. <rshahane@mcguirewoods.com>
**Subject:** [EXTERNAL] RE: Rhode Island Hospital / Production of Search Terms

David,

We are happy to connect.  Would Monday of next week work?

Thanks.

Clint

**Clint Narver**
Partner
McGuireWoods LLP
T:  +1 202 857 2481 | M: +1 703 403 0618
cnarver@mcguirewoods.com

---

**From:** Gunn, David L (CRM) <David.L.Gunn@usdoj.gov>
**Sent:** Tuesday, April 28, 2026 10:36 AM

App. 9

**To:** Narver, Clint <cnarver@mcguirewoods.com>; Dahlquist, Scott B (CIV)
<Scott.Dahlquist@usdoj.gov>
**Cc:** Olshan, Eric G. <eolshan@mcguirewoods.com>; Shahane, Rhea T.
<rshahane@mcguirewoods.com>
**Subject:** RE: Rhode Island Hospital / Production of Search Terms

**EXTERNAL EMAIL; use caution with links and attachments**

Good morning Clint and Eric,

I've been out a few weeks and hope all is well.  In reviewing our production charts, it does
not appear we have received any productions from your client in light of your search terms
below.  (In fact, it appears the one and only production was in August 2025).  Can we
conference this week regarding status?

**From:** Narver, Clint <cnarver@mcguirewoods.com>
**Sent:** Wednesday, February 4, 2026 10:52 AM
**To:** Gunn, David L (CRM) <David.L.Gunn@usdoj.gov>; Dahlquist, Scott B (CRM)
<Scott.B.Dahlquist@usdoj.gov>
**Cc:** Olshan, Eric G. <eolshan@mcguirewoods.com>; Shahane, Rhea T.
<rshahane@mcguirewoods.com>
**Subject:** [EXTERNAL] Rhode Island Hospital / Production of Search Terms

David and Scott,

Following up on our recent call, please see the attached correspondence.

Best,

Clint

**Clint Narver**
Partner
McGuireWoods LLP
T:  +1 202 857 2481 | M: +1 703 403 0618
cnarver@mcguirewoods.com

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended
recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

App. 10

# EXHIBIT 3



# Contact Enforcement & Affirmative Litigation Branch

By U.S. Postal Service:

> Enforcement & Affirmative Litigation Branch
> U.S. Department of Justice
> Civil Division
> 950 Pennsylvania Avenue, N.W.
> Washington, DC 20530-0001

*Note: Electronic media should not be sent to the Enforcement & Affirmative Litigation Branch using the U.S. Postal Service.*

To make alternate arrangements for the delivery of electronic media or other items, please contact the attorney assigned to your case.

*Updated October 1, 2025*

 **U.S. Department of Justice**

Civil Division

950 Pennsylvania Avenue NW

Washington DC 20530-0001

Civil.Feedback@usdoj.gov

 Phone: 202-514-2000

App. 12

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| IN THE MATTER OF ADMINISTRATIVE SUBPOENA 25-1431-032 | Civil Action No. 4:26-MC-0006-O |

**DECLARATION OF DR. PHYLLIS DENNERY, M.D.**

I, Dr. Phyllis Dennery, declare as follows:

1.      I am the chief of pediatrics for Brown University Health ("Brown Health") and pediatrician-in-chief for Rhode Island Hospital.  I have served in this role for 11 years.

2.      RIH provides comprehensive, multi-disciplinary gender-affirming care in Rhode Island, including through the Gender and Sexuality Program at Hasbro Children's Hospital, which is the pediatric division of RIH.  Hasbro Children's Hospital's primary place of business is 593 Eddy St, Providence, RI 02903.

3.      I understand that the Department of Justice (the "Government") issued a subpoena (the "Subpoena") to RIH in July 2025, and that the Subpoena requests production of medical records and confidential personal information concerning minor patients who received gender-affirming care at RIH.

4.      The Government's request for patient information will have detrimental effects that will impact the entire RIH patient population, their families, and the broader community.

5.      The patient-physician relationship is essential in helping people to live healthy, productive lives. The cornerstone of that relationship is confidentiality. Patients seek medical care from RIH with the understanding that RIH will maintain the confidentiality of their highly sensitive and private medical records and personal information.

App. 14

6.     Trust is critical to the patient-physician relationship, especially for minor patients seeking gender-affirming care, who may experience harassment, bullying, and other traumatic events if private information about their care were to be disclosed outside the patient-physician relationship. Trust between a physician, patient, and the patient's family members allows for open, honest, and thorough discussion of a patient's medical conditions, questions, concerns, and potential treatment plans.

7.     Production of a patient's medical records, name, Social Security number, and/or home address in response to the Subpoena will result in identification of the patient and disclosure of the patient's most intimate and personal details to the Government.  Such disclosure could cause severe emotional distress for the patient and their family and could expose the patient and their family to the possibility of harassment, discrimination, and violence, especially if that information was leaked to the public.

8.     Disclosure of minor patients' highly sensitive and private medical could have a chilling effect on these patients, decreasing the likelihood that an already vulnerable class of patients will continue to seek medical care. Moreover, any patients who do continue to seek medical care are likely to be reluctant to disclose sensitive information out of fear of similar government requests.

9.     The disclosure of patient records to the Government, accordingly, would undermine the trust that patients have in their doctors, eroding the patient-physician relationship and making it more difficult for medical providers to accurately diagnose and provide effective medical care to patients.

10.     The patient's privacy would not be protected by simply redacting the patient's name or address from records, as patients typically disclose other personally identifiable information to

App. 15

their providers—such as their relationships in school, parents' occupations, and extra-curricular activities—during their care.

11.    For all the reasons above, I believe that disclosure of the patients' medical records pursuant to the Subpoena would cause irreparable harm to the patients.  I also believe that disclosure of patients' medical records pursuant to the Subpoena will irreparably harm the relationship between patients and medical care providers at RIH, which is based on trust and confidentiality.

12.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 05/06/2026                    /s/ _____

                                     Dr. Phyllis Dennery, M.D.

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

IN THE MATTER OF
ADMINISTRATIVE SUBPOENA 25-
1431-032

Civil Action No. 4:26-MC-0006-O

**DECLARATION OF DR. ABIGAIL DONALDSON, M.D.**

I, Dr. Abigail Donaldson, declare as follows:

1.       I am the division director of the Adolescent Medicine Division of Hasbro Children's at Rhode Island Hospital (RIH). I have served in this role for 5 years.

2.       RIH provides comprehensive, multi-disciplinary gender-affirming care in Rhode Island, including through the Gender and Sexuality Program at Hasbro Children's Hospital, which is in the pediatric division of RIH.  Hasbro Children's Hospital's primary place of business is 593 Eddy St, Providence, RI 02903.

3.       As part of its gender-affirming care services for minors, RIH uses a patient-centered, consent-based process to better understand its patients' gender and sexual health care needs and goals. The range of services it provides includes thorough medical and psychosocial evaluations, initiation and continuation of gender care and hormone therapy, and referrals to other providers and community resources.

4.       I understand that the Department of Justice (the "Government") issued a subpoena (the "Subpoena") to RIH in July 2025, and that the Subpoena requests production of medical records and confidential personal information concerning minor patients who received gender-affirming care at RIH.

App. 18

5.      A minor patient who receives gender-affirming care at RIH, along with that patient's parents or guardian, typically meet with one or more RIH providers and collaborating medical professionals over the course of multiple visits.  No minor is seen at RIH for gender-affirming care without the knowledge and consent of their parent or legal guardian.

6.      Throughout those visits and in related communications, the patient discloses private information about their mental health, sexual health, and fertility; information about relationships in school, parents' occupations, and neighborhood; names of families and friends, family medical history, any involvement with Rhode Island Department of Children, Youth, and Families or other state agencies; and more.  All such disclosures are made to RIH for purposes of diagnosing and treating the patient.

7.      During the course of the patient's care, the patient, along with the patient's parents, typically discuss a recommended treatment plan and any concerns about the treatment plan privately with the patient's provider. Each patient has a uniquely tailored care plan based on their mental health and medical assessments.

8.      If medical treatment is being considered, and especially gender affirming hormone treatment, the assessment process includes a thorough medical and psychosocial evaluation of the patient, which includes (but is not limited to) evaluating the patient's physical function, cognitive abilities, communication skills, emotional functioning, and capacity for decision-making.

9.      No medical treatments will begin until after informed consent is obtained from the parent(s)/legal guardian(s) with medical decision-making authority over the minor patient, and the minor patient provides their consent.

App. 19

10.     Part of a patient's medical treatment plan may include taking hormonal medications. A provider, in consultation with the patients and their families, will determine which medications best serve the medical needs of the patient.

11.     The patient-physician relationship is sacred and fundamental. Confidentiality is central to that relationship. Patients seek medical care from RIH with the understanding that RIH will keep their highly sensitive and private medical records and personal information confidential.

12.     Production of a patient's medical records, name, Social Security number, and/or home address in response to the Subpoena will result in identification of the patient and disclosure of the patient's most intimate and personal details to the Government. Any such disclosure could cause severe emotional distress for the patient and family members and expose the patient and family members to the possibility of bullying, harassment, discrimination, and violence. Moreover, disclosure of this information will curtail the likelihood that an already vulnerable population of individuals will receive the care they need. The chilling effect caused by disclosure of patient records could also extend beyond gender-affirming care treatment to other aspects of medical care, such as mental health treatment, preventative care, emergency care, and other subspecialty care.

13.     The patient's privacy would not be protected by simply redacting the patient's name or address from records, as patients typically disclose other personally identifiable information to their providers—such as their relationships in school, parents' occupations, and extra-curricular activities—during their care.

14.     For all the reasons above, I believe that disclosure of the patients' medical records would cause irreparable harm to the patients. I also believe that disclosure of patients' medical records will irreparably harm the relationship between patients and medical care providers at RIH, which is based on trust and confidentiality.

App. 20

15.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 5|6|26

/s/ _____

Dr. Abigail Donaldson, M.D.

App. 21

# Exhibit 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **IN THE MATTER OF ADMINISTRATIVE SUBPOENA 25-1431-032** | § § § § § § § § § | **Civil Action No. 4:26-MC-00006-O** |

## ORDER

Before the Court is Rhode Island Hospital's (the "Hospital") Emergency Motion for Stay Pending Appeal (ECF No. 7). The Hospital requests a ruling on its Motion by May 8, 2026. While the Court will work expeditiously to ensure a speedy ruling on the Motion, the Court notes that it is in trial as of the date of this Order and will likely remain in trial until May 13, 2026. The Court also notes that the Hospital does not have to comply with the Subpoena until May 14, 2026. Accordingly, the Court **ORDERS** the government to respond to the Hospital's Motion to Stay no later than **12:00 P.M. on May 8, 2026**. The Court will issue a ruling on the Hospital's Motion as soon as is practicable.

**SO ORDERED** on this **7th day** of **May, 2026.**

_____
Reed O'Connor
**CHIEF UNITED STATES DISTRICT JUDGE**

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

IN THE MATTER OF
ADMINISTRATIVE SUBPOENA
25-1431-032

Case No. 4:26-mc-006-O

**GOVERNMENT'S RESPONSE IN OPPOSITION TO EMERGENCY
MOTION FOR STAY PENDING APPEAL**

Less than a week ago, but about ten months after the issuance of the subpoena in question, this Court ordered Rhode Island Hospital ("RIH") to comply with the subpoena. RIH now seeks a stay pending appeal. For the reasons described herein, RIH has not met its burden to demonstrate entitlement to the "extraordinary relief" of a stay, and its motion should be denied.

**BACKGROUND**

On July 3, 2026, the Government issued a subpoena pursuant to its 18 U.S.C. § 3486 subpoena authority to RIH. Doc. 1-2. The subpoena's return date was August 7, 2025. *Id.* at 1. RIH did not move to quash the subpoena within the statutory deadline to do so. In fact, it engaged with the Government and represented to the Government that it would at least partially comply with the subpoena. However, over the ensuing roughly nine months, the Hospital produced one six-page document, and it never moved to quash.

On April 30, 2026—nearly ten months after the Hospital was served with the subpoena, and nearly nine months after a motion to quash was due under the statute, *see*

18 U.S.C. § 3486(a)(5)—the Government moved to enforce the subpoena in the in this

Court, which is where this nationwide investigation is being carried on. 18 U.S.C.

§ 3486(c). That same day, this Court signed an order enforcing the subpoena. *In the*

*Matter of Administrative Subpoena 25-1431-032* (N.D. Tex. 2026 Apr. 30, 2026) (Doc. 2

at 1). RIH appealed and moved this Court to stay its order.

### ARGUMENT

A stay pending appeal is "extraordinary relief" for which the movant bears a "heavy

burden." *Plaquemines Par. v. Chevron USA, Inc.*, 84 F.4th 362, 373 (5th Cir. 2023). In

determining whether RIH has met its burden, the Court considers "four factors": "'(1)

whether the stay applicant has made a strong showing that he is likely to succeed on the

merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether

issuance of the stay will substantially injure other parties interested in the proceeding;

and (4) where the public interest lies.'" *United States v. Texas*, 97 F.4th 268, 274 (5th Cir.

2024) (quoting *Nken v. Holder,* 556 U.S. 418, 426 (2009)). "The first two factors of the

traditional standard are the most critical." *Id.* (quoting *Nken*, 556 U.S. at 434). But "[a]

stay pending appeal 'is not a matter of right, even if irreparable injury might otherwise

result.'" *Id.* (quoting *Nken*, 556 U.S. at 427).

### I.   RIH Is Unlikely to Prevail on Appeal

#### a.   RIH's Procedural Argument Is Unlikely to Prevail

RIH first claims a likelihood of success on the merits because it did not receive

"notice and an opportunity to respond before enforcement." Doc. 7 at 4–6 (quotation

omitted). But this Court's procedure in enforcing the subpoena was proper, and RIH is

unlikely to prevail on appeal. An administrative subpoena enforcement proceeding is designed to be summary in nature and to employ flexible procedures to ensure a speedy resolution of the matter. "The great discretion afforded by motion rules is appropriate when regulating the form of opposition to subpoena enforcement because . . . subpoena enforcement is meant to be a summary proceeding." *EEOC v. Bay Shipbuilding Corp.*, 668 F.2d 304, 310 (7th Cir. 1981).

RIH asserts that a response from a nonmovant is *required* prior to a district court deciding a motion. But the Fifth Circuit has said the opposite. A "district court does not abuse its discretion or violate a non-movant's due process rights by deciding a motion to dismiss before the non-movant has responded if 'the response would [not] have affected the outcome of the decision.'" *Vodicka v. Ermatinger*, No. 3:19-CV-0056-B, 2022 WL 992600, at *10 (N.D. Tex. Apr. 1, 2022) (alteration adopted) (quoting *United States v. Rand*, 924 F.3d 140, 144–45 (5th Cir. 2019)). So too here. Even though a nonmovant is obviously permitted to *attempt* to surmount its "heavy burden" to resist an administrative subpoena, *United States v. Zadeh*, 820 F.3d 746, 757 (5th Cir. 2016), a district court need not wait for a response if the district court reasonably believes that the response will not change the outcome. *See Vodicka*, 2022 WL 992600 at *10.[1] In such a circumstance, the "central question" is "whether the response would have affected the outcome of the district court's decision." *Rand*, 924 F.3d at 145.

Here, given the fulsomeness of the Government's application for enforcement, the presumption of regularity afforded prosecutorial activity, *United States v. Armstrong*, 517

---

[1] Moreover, with RIH's response now before it, the Court can and should make clear that it has considered and rejected RIH's arguments against enforcement.

3

U.S. 456, 464 (1996), RIH's long-term noncompliance with the instant subpoena, and the fact that Government made the Court aware of arguments made to other district courts that have misguidedly quashed nearly identical subpoenas, the Court could reasonably have determined that RIH's opposition would not have affected the outcome of its decision. As explained *infra*, the merits arguments RIH now offers are meritless and do not go to the facial validity or procedural adequacy of the subpoena. Instead, RIH improperly challenges the legal theories the Government might ultimately use in a criminal prosecution, as well as Executive Branch officials' statements about gender-related medical procedures performed on minors. These are not valid bases upon which a party may resist an administrative subpoena. Put simply, RIH's arguments would not have changed the outcome of this Court's decision.

RIH cites *Sandsend Financial Consultants, Ltd. v. Federal Home Loan Bank Board* for the proposition that the district court in that case "robb[ed]" the government of "its right to be heard" in opposition to a motion to quash. Doc. 7 at 4 (quoting 878 F.2d 875, 881 (5th Cir. 1989)). But *Sandsend* does not stand for the proposition that a nonmovant must be permitted a response in all administrative subpoena proceedings; in fact, the case involves a statute that *requires* the agency to respond to a motion to quash. *See* 878 F.2d at 881. Moreover, the Fifth Circuit has never said that subpoena enforcement proceedings are somehow exempted from the discretion afforded to district judges—recognized in *Rand*—to decide motions without responses in appropriate circumstances. And even in *Sandsend*, the Fifth Circuit did not "remand for reconsideration under the proper procedure." *Id.* Instead, because the record permitted "only one resolution" of the issue

4

on appeal, the Fifth Circuit decided against "wast[ing] precious resources remanding the case," and proceeded to reverse in order to uphold the subpoena's validity. *Id.* The record here, too, only permits one resolution—enforcement of the subpoena. *See infra* at 7–12. A stay is therefore unwarranted.

In sum, the Government filed a fulsome enforcement application nearly ten months after it issued a subpoena to RIH and nine months after RIH could have filed a motion to quash that subpoena in its home district. The Court reviewed the application, was aware of arguments against enforcement, and found that the Government met the requirements for summary enforcement. Nothing more was required to grant the Government's petition.

### b.  Venue Is Proper in This District

RIH is also unlikely to succeed on appeal in its venue argument. As described in the attached Declaration from the Acting Director of the Enforcement and Affirmative Litigation Branch, the "investigation is being carried on" in this district, and venue is therefore proper. *See generally* Hsiao Declaration (motion to file under seal and ex parte pending).

RIH's arguments to the contrary are factually and legally incorrect. First, as discussed in the Declaration, there is substantial operational and decision-making control of the investigation being exercised at the U.S. Attorney's Office in the Northern District of Texas, along with several subjects and potential targets of the investigation located here. Also as discussed in the Declaration, while the investigation is indeed nationwide in scope, the Government did not simply decide that it would park the investigation in this

District to bring enforcement petitions and nothing else. Rather, there are substantial investigative steps happening here.

Legally, RIH's venue arguments fare little better. RIH's case citations involve statutes authorizing civil investigative demands from various federal agencies that operate in a different way than the statute at issue here. *See* Doc. 7 at 7. Indeed, Section 3486 authorizes the *Attorney General* to issue subpoenas in support of *criminal* investigations and permits the Government to bring enforcement actions in "any court of the United States within the jurisdiction of which the [criminal] investigation is carried on." Criminal charges do not spring forth from Government agencies in Washington, D.C.; rather, our Constitution requires that serious criminal charges be presented to grand juries in one of the 94 federal judicial districts of the United States. Hence, cases that parse different statutes and try to determine whether federal agency administrative investigations— which might not require court filings at all, let alone presentments to a grand jury—are being conducted in some amorphous sense in Washington, D.C., are not particularly relevant.

Similarly, 18 U.S.C. § 3486(c) uses purposefully capacious language, stating that the enforcement action can be brought in "any" district where the investigation is being "carried on." This is inclusive, not exclusive, language, and RIH does not meaningfully engage with it. RIH essentially argues that, to interpret this language, this Court should determine the location of the "command center" (whatever that is) for the Government's investigation and/or the location of some Government personnel with whom RIH has interacted, and permit the Government to bring enforcement actions only in that place.

Doc. 7 at 7. But determining the location of the "command center" of the Government's investigation has nothing to do with the statute that Congress passed.

In sum, this investigation is being "carried on" in the Northern District of Texas. RIH's venue arguments are therefore contrary to both the facts and the law. RIH is unlikely to prevail on appeal on this issue.

### c.  The Subpoena Is Proper

RIH is also unlikely to prevail on appeal on its arguments about the lawfulness of the subpoena. RIH argues that the subpoena is "unlawful" because it claims that the Government is proceeding on a theory that "'off label use of puberty blockers and cross sex hormones' is 'a violation of the FDCA.'" Doc. 7 at 8. But that is not what the Government argued in its Petition, nor is it what the Government is doing here. *See* Doc. 1 at 3–4 (explaining that when a drug is distributed for an intended use not approved by FDA—a potential FDCA violation—and an insurance plan pays for that drug, the FDCA violation becomes a "federal health care offense" under 18 U.S.C. § 24 and therefore may be investigated through a HIPAA subpoena). The Government does not contend that the mere act of off-label prescribing by a physician constitutes an FDCA offense.

While the FDCA does not generally regulate the practice of medicine, federal health care law obviously does proscribe many practices directly related to the practice of medicine, such as: the unlawful dispensing of unapproved drugs, prescription medications, and controlled substances, 21 U.S.C. §§ 331(a), 841; the making of false statements in relation to claims to public and private insurance payors, 18 U.S.C. § 1035; fraud on patients and insurance payors, 18 U.S.C. § 1347; and many others. A white coat

does not confer immunity from such laws. RIH's suggestion that the federal government has no role in ensuring that medical practitioners obey federal law while practicing medicine is absurd. HIPAA expressly grants authority to issue subpoenas in investigating potential violations of federal healthcare laws, including the FDCA.

But the larger problem with these arguments is that they are not cognizable in a subpoena enforcement action. A subpoena recipient "may not avoid an administrative subpoena on the ground that it has a valid defense to a potential subsequent lawsuit" and cannot raise "factual challenges based on a lack of statutory 'coverage'" of a recipient's activities. *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1076–77 (9th Cir. 2001); *Donovan v. Shaw*, 668 F.2d 985, 989 (8th Cir. 1982) ("[A] subpoena enforcement proceeding is not the proper forum in which to litigate the question of coverage under a particular federal statute."); *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 5 (1st Cir. 1996) ("[Q]uestions concerning the scope of an agency's substantive authority to regulate are not to be resolved in subpoena enforcement proceedings."). That principle dates back over 80 years to Supreme Court decisions rejecting efforts to contest subpoenas based on claims that the investigating agency lacked authority over the matter. *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 213–14 (1946); *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 508–09 (1943).

That rule follows from the posture of such proceedings: "[s]ubpoena enforcement proceedings are designed to be summary in nature and an agency's investigations should not be bogged down by premature challenges to its regulatory jurisdiction." *Sturm*, 84 F.3d at 5 (citation and quotation omitted). Were it otherwise, every subpoena recipient

could seek to pre-litigate issues of potential liability or statutory coverage, which would "stop much if not all of investigation in the public interest at the threshold of inquiry." *Oklahoma Press*, 327 U.S. at 213. It is thus enough to say that "an administrative subpoena is to be enforced unless agency authority is plainly lacking." *EEOC v. Federal Express Corp.*, 558 F.3d 842, 851 n.3 (9th Cir. 2009).

In short, RIH's arguments sound in hypothesizing a possible Government enforcement action and trying to explain why RIH believes it will be meritless. But such arguments have no place in administrative subpoena enforcement proceedings. RIH's protestations about its perception of the Government's view of the FDCA is precisely the sort of argument based on statutory coverage that cannot be entertained at this stage.

RIH's position would immunize all conduct even tangentially related to off-label prescribing from federal investigation, an incorrect and dangerous argument. FDA has not found that these drugs are safe and effective to treat gender dysphoria or any other mental disorder. Off-label use of drugs such as these can expose patients to unproven and potentially dangerous treatments without adequate evidence of safety and effectiveness. These risks are particularly acute where, as here, the patients involved are children, which makes them especially vulnerable. As the comprehensive, peer-reviewed November 2025 HHS report explains:

> [I]n studies, PBs [puberty blockers] are followed by cross-sex hormones (CSH) over 90% of the time; this de facto combination therapy introduces new and potentially serious risks (e.g., concerning fertility) and has never been subjected to any FDA-regulated clinical trial for any population. Further, research shows that when the evidence supporting a particular off-label use is of very low certainty—as is the case for PMT [pediatric medical transition]—the already elevated risk of adverse effects associated with off-label use is increased even further.

U.S. DEP'T OF HEALTH & HUM. SERVS., TREATMENT FOR PEDIATRIC GENDER DYSPHORIA: REVIEW OF EVIDENCE AND BEST PRACTICES 102 (Nov. 19, 2025) ("HHS REVIEW"). Although off-label prescribing itself is a generally permitted practice under federal law, "[t]he unfavorable risk/benefit profile distinguishes [puberty blockers and cross-sex hormones for minors] from many other off-label uses of drugs and medical devices." *Id.* at 231.

Moreover, the widespread off-label use of these powerful drugs also undermines the regulatory system that Congress established to ensure that drugs are used consistent with sound scientific data. *See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 619 (1973) (noting that legislative history for portions of FDCA "show a marked concern that impressions or beliefs of physicians [regarding a drug's efficacy], no matter how fervently held, are treacherous"). The FDCA rests on the premise that safety and efficacy must be demonstrated through rigorous, publicly accountable testing, rather than assumed based on clinical theory or intuition, or shaped by advocacy-driven ideology unrelated to scientific rigor. *Cf.* HHS REVIEW, at 210–217 (finding that appearance of broad medical consensus was largely manufactured through reliance on small committees aligned with advocacy-based organizations such as World Professional Association for Transgender Health (WPATH) and marked by suppression of dissenting views and discouragement of scientific debate).

The subpoena here seeks information relevant to an FDCA investigation in two respects. *First*, RIH may itself be engaged in conduct that implicates the FDCA, as the Hsiao Declaration attached to the Government's initial Petition (Doc. 1-1) explains. There

10

is no basis to predetermine in a subpoena proceeding, as explained *supra*, without the benefit of any factual record, the potential scope of RIH's activities, and its relationship to the statute.

*Second*, RIH may also have relevant information about the conduct of manufacturers and distributors of drugs that may have violated the FDCA. In particular, misbranding, via false or misleading "written, printed, or graphic matter" on a drug, container, or wrapper or that supplements, explains, or is designed for use with a drug, is a classic FDCA violation. *See, e.g.*, *United States v. Marschall*, 82 F.4th 774, 779 (9th Cir. 2023) (upholding misbranding conviction of the defendant who shipped drugs with false informational sheets). Drug manufacturers and distributors also can be convicted of FDCA violations, for example, for shipping drugs in interstate commerce intending that they be used off-label, with that intent frequently shown through evidence of promoting the drugs for such uses. *See* 21 C.F.R. § 201.128 (intent may "be shown by labeling claims, advertising matter," "oral or written statements," and "circumstances in which the [drug] is, with the knowledge of" certain persons, "offered or used for a purpose for which it is neither labeled nor advertised"); *see, e.g.*, *United States v. Cephalon, Inc.*, No. 2:08-cr-598 (E.D. Pa. Oct. 10, 2008), Doc. 11 (conviction of manufacturer for promoting three drugs for off-label uses). Thus, in such prosecutions, the government may rely on evidence of communications between pharmaceutical sales representatives and prescribing physicians and recommendations to doctors of diagnostic codes to mask off-label prescriptions to ensure payment for unapproved uses. *See, e.g.*, *Cephalon*, Doc. 1, ¶¶ 12–18 (criminal information); Press Release, U.S. Dep't of Just., *Eli Lilly and*

*Company to Pay U.S. $36 Million Relating to Off-Label Promotion* (Dec. 21, 2005),

https://perma.cc/2Y64-FUK5 (announcing guilty plea of drug manufacturer involving

illegal off-label promotion, highlighting evidence that the defendant "[e]ncourag[ed] sales

representatives … to send unsolicited medical letters to promote the drug for an

unapproved use to doctors").

The subpoena here is plainly calculated to seek this same sort of evidence, including

(for example) materials from and communications with manufacturers and sales

representatives regarding the use of puberty blockers or hormones (Requests 7 through 9)

and evidence of manufacturers' financial incentives to prescribing physicians to prescribe

puberty blockers or hormones (Request 10). Similarly, billing codes and communications

with manufacturers or distributors about billing for off-label uses (Requests 3 through 6)

may produce evidence of intentionally misleading coding that could, in turn, be traced to

manufacturers or distributors attempting to conceal misbranding.

The initial Hsiao Declaration details precisely how and why each category of

information the subpoena seeks is relevant and necessary to further the Government's

investigation, including how physician prescribing practices are relevant. *See* Doc. 1-1 at

¶¶ 43–44. The requested records bear directly on whether the practices surrounding

distribution, promotion, and the sale of these drugs—unproven as safe and effective for

treating gender dysphoria or any other mental disorder—may be violating federal law and

endangering children. Such inquiries fall squarely within the Government's statutory

mandate to protect the public from misbranded, adulterated, and unapproved drugs. *See*

*United States v. Dotterweich*, 320 U.S. 277, 285 (1943) (FDCA protects the "innocent public who are wholly helpless" to protect themselves from such products).

## II. RIH Will Not Suffer Irreparable Harm

RIH's motion also fails on the second requirement, that it prove it will be irreparably harmed absent a stay. "[A] showing of irreparable harm is a necessary prerequisite for a stay," *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 64 (D.C. Cir. 2024), and RIH has not made such a showing. "The irreparable-harm analysis focuses on the *moving party*, not the nonmoving party or some third party." *Kansas v. United States*, 124 F.4th 529, 534 (8th Cir. 2024) (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)) (emphasis added).

RIH's assertions about irreparable harm are that responding to the subpoena will moot the case, that it will cost money to collect documents to respond to the subpoena, and that its relationships with its patients will be harmed absent a stay. Doc. 7 at 12–14. Even crediting the untested, general affidavits RIH offers, none of these things qualifies as cognizable irreparable harm.

First, producing documents to the Government is not irreparable harm and will not moot the case. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12–15 (1992) (holding that still-available remedies prevent subpoena challenges from becoming moot after disclosure of documents in compliance with subpoena). The subpoena requires production of nonprivileged, pre-existing business records of a large, closely regulated healthcare provider. Accepting RIH's argument would mean that any time a court orders

13

compliance with a subpoena, the subpoenaed party would automatically be able to make a showing of irreparable harm. That is not and cannot be not the law.

Moreover, RIH has not explained how the Government seeing its nonprivileged business records as part of a lawful criminal investigation could possibly qualify as irreparable harm—the only consequence would be the Government investigating to see whether federal law was violated. In fact, even if there is "harm" from the Government seeing RIH's documents, that harm is eminently reparable: The Court can order complete return of the documents on any potential remand if RIH is successful on appeal, and the Court can order that no information gleaned from those documents be used in the investigation. That is an adequate remedy to address the concern. *See United States ex rel. Barko v. Halliburton Co.*, 4 F. Supp. 3d 162, 169 (D.D.C. 2014); *Church of Scientology*, 506 U.S. at 15 ("[T]his case is not moot because if the summons were improperly issued or enforced a court could order that the IRS' copies of the tapes be either returned or destroyed.").

Second, spending money to comply with the subpoena is not an irreparable harm to RIH because, among many other things, "[t]he burden of complying with a subpoena does not constitute irreparable injury." *Nikon Corp. v. GlobalFoundries U.S., Inc.*, No. 17-MC-80071, 2017 WL 4865549, at *2 (N.D. Cal. Oct. 26, 2017). "In general, the cost to businesses of complying with governmental subpoenas are normal costs of doing business which should be borne by the company." *Hurt v. Dime Sav. Bank*, 151 F.R.D. 30, 31 (E.D.N.Y. 1993). RIH is a large, highly-regulated healthcare provider, and its parent company owns multiple such hospitals; spending money to comply with Government

14

subpoenas is unremarkable and certainly not irreparable for such an institution. And that purported harm is even less understandable here: RIH sat on the subpoena for ten months and produced one document. Because RIH did not move to quash, it could or should have been collecting, reviewing, and readying documents for production. Its failure to move to quash or comply with the subpoena over the course of ten months cannot constitute irreparable harm now. "[S]elf-inflicted harm is not irreparable." *Texas v. EPA*, 662 F. Supp. 3d 739 (S.D. Tex. 2023); *see Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (no irreparable harm where litigant "could have avoided this problem" by adopting a different litigation strategy).

Finally, the disclosure of patient records to the Government does not constitute irreparable harm to RIH's relationships with its patients. The Government understands that patients would prefer to keep their medical records private—indeed, that was one of the animating purposes of HIPAA, of which the administrative subpoena provision of the statute is a key element. But it does not follow that patients' preference for privacy would lead to irreparable harm to *RIH*, which is the only relevant inquiry. *Kansas*, 124 F.4th at 534.

First, this investigation is not—and has never been—an investigation of patients or parents seeking treatment for gender dysphoria, and the subpoena statute at issue generally forbids the Government from using patient medical records to investigate patients. 18 U.S.C. § 3486(e). But more importantly, the Hospital's ubiquitous privacy practices disclosure for patient treatment—a familiar feature in all modern healthcare settings—discloses to all RIH patients that patient health information may be shared with

15

the Government in response to subpoenas for law-enforcement investigations, as well as numerous other types of disclosures. Lifespan Joint Privacy Notice at 7, available at https://www.brownhealth.org/sites/default/files/2021-07/EN-Joint-Privacy-Notice-English_2021.pdf. RIH does not mention this fact or even attempt to explain how it could be irreparably harmed by doing something that it disclosed to patients it could do and that it is legally obligated to do.

### III.    The Balance of Equities Does Not Favor RIH

Because RIH does not make an adequate showing on the first two factors, balancing the other factors is unnecessary. But even if the Court were convinced RIH made some sort of showing on either factor, that showing is outweighed by the Government's interest in enforcing the law and in continuing a lawful investigation that is a priority of the Executive Branch—and this is also the public's interest. "[I]n the context of a stay, assessing the harm to the opposing party and weighing the public interest merge when the Government is the opposing party." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). The Government has an "uncontested interest" in the "faithful execution of law." *Newsom v. Trump*, 141 F.4th 1032, 1054 (9th Cir. 2025). Indeed, "[t]he government has a compelling interest in identifying illegal activity and in deterring future misconduct," and that interest "outweighs the privacy rights of those whose [medical] records" are sought via a properly issued HIPAA subpoena, "particularly in light of the limitation placed on uses of subpoenaed information by § 3486." *In re Subpoena Duces Tecum*, 228 F.3d 341, 351 (4th Cir. 2000); *see also Samia v. United States*, 599 U.S. 635, 655 (2023) (reiterating the government's

16

"compelling interest in finding, convicting, and punishing those who violate the law" (citation omitted)).

In short, RIH producing nonprivileged business records to the Government as part of a lawful investigation into violations of federal law is not a harmful act at all, let alone one that would support the "extraordinary relief" of a stay pending appeal.

## CONCLUSION

This Court should deny the motion for a stay pending appeal.


Dated: this 8th day of May 2026.

Respectfully submitted,


RYAN RAYBOULD                          BRETT A. SHUMATE
United States Attorney                 Assistant Attorney General


ETHAN WOMBLE                           JORDAN C. CAMPBELL
Assistant United States Attorney       Deputy Assistant Attorney General


U.S. Attorney's Office                 BRANTLEY T. MAYERS
State Bar No. 24102757                 Counsel to the Assistant Attorney General
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102                LISA K. HSIAO
Fax: 214-659-8809                      Acting Director
ethan.womble@usdoj.gov                 Enforcement & Affirmative Litigation
                                          Branch


                                        /s/ Patrick R. Runkle
                                       ROSS S. GOLDSTEIN
                                       PATRICK R. RUNKLE
                                       Assistant Directors
                                       United States Department of Justice
                                       Enforcement & Affirmative Litigation
                                          Branch
                                       P.O. Box 386
                                       Washington, DC 20044

17

Tel:  (202) 532-4723
Fax:  (202) 514-8742
Patrick.R.Runkle@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2026, I electronically filed this Opposition and it is

available for viewing and downloading from the Court's CM/ECF System, and the

participants in the case that are registered CM/ECF users will be served electronically by

the CM/ECF system.


 /s/ Patrick R. Runkle
PATRICK R. RUNKLE
Assistant Director

18

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9th, 2026, the foregoing was filed with the Clerk of the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. On the same day, a copy of the foregoing was served upon all counsel of record listed below via CM/ECF and email:

Patrick Raymond Runkle
U.S. Department of Justice
Consumer Protection Branch
PO Box 386
Washington, DC 20044-0386
T: (202) 616-0219
F: (202) 514-8742
patrick.r.runkle@usdoj.gov

Ethan Womble
U.S. Department of Justice
801 Cherry Street
Suite 1700
Fort Worth, TX 76102
T: (214) 287-0162
ethan.womble@usdoj.gov

*Counsel for Appellee the United States of America*

*/s/ Eric G. Olshan*
Eric G. Olshan

*Counsel for Appellant Rhode Island Hospital*