**No. 26-10431**

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

IN RE ADMINISTRATIVE SUBPOENA NO. 25-1431-032

UNITED STATES OF AMERICA,

*Petitioner-Appellee*,

v.

RHODE ISLAND HOSPITAL,

*Respondent-Appellant.*

On Appeal from the United States District Court
for the Northern District of Texas, Chief Judge Reed O'Connor
No. 4:26-mc-00006-O

## OPPOSITION TO EMERGENCY MOTION FOR STAY PENDING APPEAL

RYAN RAYBOULD
  *United States Attorney*

ETHAN WOMBLE
  *Assistant United States Attorney*
  *U.S. Attorney's Office*
  *801 Cherry Street, Suite 1700*
  *Forth Worth, Texas 76102*

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH
JOHN BAILEY
BRANTLEY MAYERS
  *Attorneys, Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3180*

## CERTIFICATE OF INTERESTED PERSONS

*In re Administrative Subponea No. 25-1431-032:*
*United States of America v. Rhode Island Hospital*

A certificate of interested persons is not required, under Fifth Circuit Rule

28.2.1, as appellee is a governmental party.

*/s/ John Bailey*
John Bailey

# TABLE OF CONTENTS

**Page**

INTRODUCTION...................................................................................................... 1

BACKGROUND....................................................................................................... 1

      A.      Statutory Background ................................................................. 1

      B.      Factual Background..................................................................... 3

      C.      Other Proceedings...................................................................... 4

STANDARD OF REVIEW....................................................................................... 4

ARGUMENT ........................................................................................................... 5

I.      RIH is not likely to succeed on the merits................................................ 5

      A.      The subpoena was validly issued. ............................................ 5

      B.      RIH's contrary arguments fail................................................. 13

II.     The non-merits factors favor the government...................................... 18

CONCLUSION ..................................................................................................... 22

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## INTRODUCTION

Rhode Island Hospital (RIH) seeks the extraordinary remedy of a stay pending appeal to avoid complying with an administrative subpoena it has stonewalled for nearly a year. Applying the narrow standard that governs subpoena enforcement proceedings, the district court correctly concluded that the Government's investigation is within its statutory authority and that the subpoena seeks information relevant to that investigation. The court subsequently considered—and correctly rejected—RIH's procedural and merits objections in denying a stay pending appeal.

RIH is unlikely to succeed on appeal. Its substantive arguments improperly attempt to litigate the merits of hypothetical future enforcement theories rather than the validity of the subpoena itself, or rest on self-inflicted harms from RIH's nearly year-long delay in complying with the subpoena. Moreover, the district court has properly rejected RIH's procedural argument. Nor can RIH establish irreparable harm. The subpoena has been outstanding since July 2025, yet RIH never timely moved to quash it and instead repeatedly represented that it would comply. Having delayed for months, RIH cannot now manufacture an emergency warranting extraordinary equitable relief. The motion for a stay pending appeal should be denied.

## BACKGROUND

### A.    Statutory Background

The Federal Food, Drug, and Cosmetic Act (FDCA) generally prohibits "misbranding" a drug. 21 U.S.C. § 352; *id.* §§ 331(a), (b), (c), (k). A drug may be

misbranded if, among other things, its labeling is false or misleading, *id.* § 352(a), or if its labeling does not bear adequate directions for its intended use, *id.* § 352(f)(1). Drug labeling is broadly defined to include any "written, printed, or graphic matter . . . accompanying" the drug. 21 U.S.C. § 321(m). The term "accompanying" includes materials that are separate from but related to the drug and any material that supplements, explains, or is designed for use with the drug. *See* 21 U.S.C. § 321(m); 21 C.F.R. § 1.3(a); *Kordel v. United States*, 335 U.S. 345 (1948); *United States v. Urbuteit*, 335 U.S. 355 (1948); *United States v. 47 Bottles*, 320 F.2d 564, 569 (3d Cir. 1963). Labeling can include promotional materials, advertisements, brochures, flyers, instruction sheets, posters, and similar materials. And "intended use[]" means the "objective intent of the persons legally responsible for the labeling of an article (or their representatives)." 21 C.F.R. § 801.4. Such intent "may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives." *Id.*

Drug manufacturers and distributors can be convicted of FDCA violations for shipping drugs in interstate commerce intending that they be used off-label, with that intent frequently shown through evidence of promoting the drugs for such uses. *See* 21 C.F.R. § 201.128 (intent may "be shown by labeling claims, advertising matter," "oral or written statements," and "circumstances in which the [drug] is, with the knowledge of" certain persons, "offered or used for a purpose for which it is neither labeled nor advertised"); *see, e.g., United States v. Endo Pharms., Inc.*, No. 1:14-CR-66

2

(N.D.N.Y. Feb. 21, 2014), Dkt. 2 (deferred prosecution agreement regarding drug manufacturer's off-label promotion of drug, highlighting evidence that manufacturer distributed a misleading scientific study and promoted off-label uses at educational presentations for physicians).  Where a violator has an intent to defraud or mislead, FDCA violations may be punishable as felonies. 21 U.S.C. § 333(a)(2).

The Health Insurance Portability and Accountability Act (HIPAA) authorizes the Department of Justice to issue administrative subpoenas to investigate FDCA violations related to services that may be paid for by a private or public health insurance program.  18 U.S.C. § 3486(a)(1)(A)(i)(I); *see* 18 U.S.C. § 24(a).

### B.    Factual Background

For months, the Department has been investigating potential FDCA investigations in connection with the provision of puberty blockers and cross-sex hormones to minors. Hsiao Decl. ¶¶ 3, 32-39, 45 (Dkt. 1-1).  As part of that investigation, the Department served the HIPAA subpoena at issue on RIH on July 9, 2025, with a return date of August 7, 2025.  *See* Dkt. 1-2 at 2; Dkt. 1-3 at 2.  To date, RIH has produced just one six-page document.  Hsiao Decl. ¶ 46.

Faced with RIH's prolonged noncompliance, the Department moved to enforce the subpoena in the Northern District of Texas, which is one district where this investigation is being carried on.  18 U.S.C. § 3486(c).  That same day, the district court signed an order enforcing the subpoena.  *In the Matter of Administrative Subpoena 25-1431-032* (N.D. Tex. 2026 Apr. 30, 2026) (Dkt. 2 at 1).

RIH appealed and sought a stay pending appeal from the district court and this Court. On May 10, the district court denied the motion, concluding that RIH was not likely to succeed on the merits, that RIH was not likely to suffer irreparable harm, and that the public interest and balance of equities favored prompt compliance to avoid further obstructing the government's ongoing investigation. *See* Stay Order, Dkt. 12 (Attachment A). The district court nonetheless stayed enforcement of the subpoena "except as to responsive non-privileged documents without a valid legal objection," until this Court rules on RIH's motion for a stay pending appeal. *Id.* at 10.

### C.    Other Proceedings

In response to the district court's order, a Rhode Island state employee sued in the District of Rhode Island seeking quashal of the subpoena. *See* Dkt. 13 (apprising district court of these proceedings); *In re Administrative Subpoena 25-1431-032 to Rhode Island Hosp.*, No. 1:26-mc-7 (D.R.I.) ("*Rhode Island Challenge*"), Dkt. 1. The District of Rhode Island has declined to apply the first-to-file rule and scheduled a hearing on the quashal motion for 2:00 p.m. today. *Rhode Island Challenge*, Text Order (May 7, 2026), Notice of Hearing (May 7, 2026). RIH has intervened in that proceeding to seek a conflicting order regarding the enforceability of the subpoena. *Rhode Island Challenge*, Dkts. 20, 28, Text Order (May 11, 2026).

### STANDARD OF REVIEW

"A stay pending appeal is extraordinary relief for which" the moving party "bear[s] a heavy burden." *Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 373

(5th Cir. 2023) (citations omitted). In considering whether a stay is warranted, the Court considers four familiar factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.*

The first factor is especially demanding here, as an order regarding the enforceability of an administrative subpoena is generally reviewed for abuse of discretion. *McLane Co. v. E.E.O.C.*, 581 U.S. 72, 75 (2017).

## ARGUMENT

### I.    RIH is not likely to succeed on the merits.

The district court did not abuse its discretion in enforcing the subpoena. The subpoena meets this Court's criteria for enforcement, and RIH's contrary arguments fail.

#### A.    The subpoena was validly issued.

This Court "has consistently recognized the summary nature of administrative subpoena enforcement proceedings." *Burlington N. R. Co. v. Off. of Inspector Gen., R.R. Ret. Bd.*, 983 F.2d 631, 637 (5th Cir. 1993). The requirements for enforcement are "minimal"—"courts will enforce an administrative subpoena if: (1) the subpoena is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome."

*Id.* at 637-38; *see United States v. Zadeh*, 820 F.3d 746, 756 (5th Cir. 2016) (applying this standard "in the context of an administrative subpoena seeking an individual's medical records"). The district court did not abuse its discretion in concluding that all three prerequisites have been met. *See* Dkt. 2 at 1; Dkt. 12 at 7.

**1.** The subpoena is within the Department's statutory authority. There is no dispute that the statutory requisites for a subpoena have been followed. The subpoena was signed by the Assistant Attorney General, properly served on RIH, and calls for the production of nonprivileged documents relevant to the investigation within 500 miles of RI Hospital. *See* Dkt. 1-2; 18 U.S.C. § 3486(a)(3). And substantively, an agency's subpoena must be enforced unless it is "plainly incompetent or irrelevant to any lawful purpose." *Fed. Election Comm'n v. Lance*, 617 F.2d 365, 368 (5th Cir. 1980) (quoting *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943)); *accord, e.g., United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 5-6 (1st Cir. 1996) ("As long as the agency's assertion of authority is not obviously apocryphal, a procedurally sound subpoena must be enforced.").

The subpoena at issue is plainly relevant to a lawful purpose. Congress has expressly authorized the Attorney General to issue subpoenas to investigate potential "Federal health care offense[s]," including qualifying offenses in the FDCA. 18 U.S.C. § 3486(a)(1)(A)(i)(I). The subpoena in this case was issued to "investigate Federal health care offenses," Dkt. 1-2 at 2. Accordingly, the subpoena issued to RIH plainly comes

6

within the Department's statutory authority. *See Burlington N. R. Co.*, 983 F.2d at 637-38.

**2.** The subpoena seeks information "reasonably relevant" to the Department's investigation in two different ways. *Burlington N. R. Co.*, 983 F.2d at 638; *see FTC v. Texaco, Inc.*, 555 F.2d 862, 874 (D.C. Cir. 1977) (en banc) ("[I]n the pre-complaint stage, . . . the relevance of the agency's subpoena requests may be measured only against the general purposes of its investigation."). First, the Department seeks records to determine whether RIH itself may have engaged in conduct that implicates the FDCA. Second, the Department seeks records from RIH to determine whether manufacturers and distributors of the drugs at issue may have violated the FDCA—conduct to which RIH may be a witness.

In the subpoena are 15 Requests, all of which extend from January 1, 2020, to the present, and that span four primary categories: (1) requests related to personnel and corporate oversight (Request 1); (2) requests related to billing, coding, and reimbursement practices (Requests 2–6); (3) requests related to the practice's relationships with drug manufacturers, distributors, and pharmacies (Requests 7–10); and (4) requests regarding clinical practices and drug safety (Requests 11–15). *See* Dkt. 1-2 at 5, 8-10. As the Hsiao Declaration explains, all of these requests are reasonably related to identifying evidence that could be used to shed light on the Government's lawful investigation. *See* Hsiao Decl. ¶¶ 41–45.

7

Request 1 seeks information to identify who had authority to direct prescribing, billing, or marketing practices to determine liability. Dkt. 1-2 at 8. Under strict liability doctrines, including the responsible corporate officer doctrine, officers and responsible personnel can be held criminally liable for FDCA violations even without direct participation. Hsiao Decl. ¶ 42. Personnel files also show financial incentives, disciplinary history, and/or training which can establish knowledge and intent. *Id.*

Requests 2 through 6 (regarding billing, coding, and reimbursement practices) are necessary to determine whether the clinic disguised treatment for gender-related mental disorders as another, physical illness (e.g., endocrine disorder) to disguise or hide potential FDCA violations and potentially secure health care benefit program reimbursements through fraud. Dkt. 1-2 at 8-9; Hsiao Decl. ¶ 43. Such practices are especially important to demonstrate an "intent to defraud or mislead" under 21 U.S.C. § 333(a)(2) if the clinic misrepresented the intended use of the drugs. Hsiao Decl. ¶ 43. Moreover, training materials and internal discussions can reveal whether improper coding was a deliberate strategy. *Id.*

Requests 7 through 10 (relating to relationships with drug manufacturers, distributors, and pharmacies) seek evidence of an intent to market or promote drugs for unapproved uses in violation of the FDCA. Dkt. 1-2 at 9; Hsiao Decl. ¶ 44. Communications between pharmaceutical sales representatives and prescribing physicians can provide evidence of off-label promotion, which would be relevant to an FDCA prosecution for misbranding drugs. *See, e.g.,* Information at 4-5, ¶¶ 12-18, *United*

8

*States v. Cephalon, Inc.*, No. 2:08-cr-598 (E.D. Pa. Sep. 29, 2008), Dkt. 1; Press Release, U.S. Dep't of Just., *Eli Lilly and Company to Pay U.S. $36 Million Relating to Off-Label Promotion* (Dec. 21, 2005), https://perma.cc/2Y64-FUK5 (highlighting evidence that the defendant "[e]ncourag[ed] sales representatives . . . to send unsolicited medical letters to promote the drug for an unapproved use to doctors").[1]  If RIH, or one of its affiliated health care providers, received promotional materials, "scientific exchange information," or payments to encourage prescribing of puberty blockers or cross-sex hormones, such information would support a FDCA theory (including conspiracy) involving the illegal misbranding of drugs and distribution of misbranded drugs or unapproved new drugs.  Hsiao Decl. ¶ 44.  Similarly, information regarding financial arrangements (consulting agreements, sponsorships, speaking honoraria) may suggest improper influence to reinforce a showing of an intent to misbrand the drugs, including with an intent to defraud or mislead.  *Id.*

---

[1] There are many similar examples.  *See, e.g.*, Press Release, U.S. Dep't of Just., *Genzyme Corporation to Pay $32.5 Million to Resolve Criminal Liability Relating to Seprafilm* (Sep. 3, 2015), https://perma.cc/P7AT-MUVT (highlighting evidence that manufacturer encouraged off-label uses by distributing promotional materials citing a misleading scientific study); *Endo Pharms., Inc.*, No. 1:14-CR-66 (N.D.N.Y. Feb. 21, 2014), Dkt. 2 (highlighting evidence that manufacturer promoted off-label uses at educational presentations for physicians); Press Release, U.S. Dep't of Just., *Wyeth Pharmaceutical Agrees to Pay $490.9 Million for Marketing the Prescription Drug Rapamune for Unapproved Uses* (July 30, 2013), https://archives.fbi.gov/archives/oklahomacity/press-releases/2013/wyeth-pharmaceutical-agrees-to-pay-490.9-million-for-marketing-the-prescription-drug-rapamune-for-unapproved-uses (highlighting evidence that manufacturer paid bonuses to incentivize off-label sales).

Requests 11 through 15 (relating to patient-level clinical practices and drug safety) will permit the United States to evaluate the scope of prescribing (including the number and age range of patients treated), and consistency of diagnoses. Dkt. 1-2 at 9-10; *see* Hsiao Decl. ¶ 45. Such information also establishes the scope of interstate distribution and the scale of potential FDCA violations. Hsiao Decl. ¶ 45. Linking each patient's clinical record to corresponding billing and insurance claims can demonstrate whether diagnoses were miscoded, which can prove fraudulent intent. *Id.* Documentation of clinical justification, informed consent, and disclosure of unapproved use is key to assessing whether the clinic (and/or potential co-conspirators) concealed or downplayed risks associated with the unapproved use of these drugs. *Id.* Absence or minimization of such warnings could establish the intent to mislead. Patient charts also typically capture adverse outcomes, side effects, and complications of drug use. *Id.* By reviewing multiple patient records, the investigative team may reveal systemic use of the same masking codes and fraudulent informed consent documents. *Id.* This enables investigators to distinguish between mere errors and an institutionalized practice.

Providing patient records including patient identities can also provide essential investigative leads. *Id.* Parents may be witnesses about what disclosures were made. Patients (depending on age and circumstances) may provide information about the informed consent process, side effects, or other false or misleading information about the drugs conveyed during treatment. *Id.* Health benefit programs tied to identified

10

patients could provide additional information including claim records, creating a reinforced evidentiary record.  *Id.*  In sum, without this information, the government cannot fully determine the scope of the violations, identify patterns of misbranding or fraudulent billing, or assess whether the conduct was undertaken with intent to defraud or mislead, as required for felony liability under 21 U.S.C. § 333(a)(2).

For these reasons, the district court did not abuse its discretion in concluding that the information sought is "reasonably relevant," *Morton Salt,* 338 U.S. at 652, to the "general purposes of the agency's investigation," *Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1268 (7th Cir. 1982) (alteration adopted and quotation omitted)).

**3**.  Finally, the subpoena's demands are "not unreasonably broad or burdensome."  *Burlington N. R. Co.*, 983 F.2d at 638.

Because the Department's "inquiry" is "a relatively broad one," "the permissible scope of materials that [can] reasonably be sought [is] necessarily equally broad." *McPhaul v. United States*, 364 U.S. 372, 382 (1960); *see Securities & Exch. Comm'n v. McGoff*, 647 F.2d 185, 192-93 (D.C. Cir. 1981).  And the Department's requests are not atypical in this area.  *See, e.g., In re Subpoena Duces Tecum*, 228 F.3d 341, 350 (4th Cir. 2000) ("[I]f Bailey had treated 15,000 patients over a period of seven years and all of them were reimbursed on claims he submitted, a suspicion of fraud on these claims would justify a review of Bailey's documentation of services to these patients, of the claims submitted on their behalf, and of the reimbursements collected."); *cf. Zadeh*, 820 F.3d at 758 (agreeing that "the subpoena was not unduly broad or burdensome albeit implicating

11

privacy interests of patients whose records are produced but are not parties to this litigation").

The subpoena is also not unduly burdensome. The information sought is relevant and not otherwise available, meaning that the subpoena is "unreasonably burdensome" only if "compliance threatens to unduly disrupt or seriously hinder normal operations of a business." *F.T.C. v. Jim Walter Corp.*, 651 F.2d 251, 258 (5th Cir. 1981) (quotation omitted), *abrogated on other grounds as recognized by Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 943 (11th Cir. 1997). RIH offers little on that score, claiming injury to the patients, an undermining of the doctor-patient relationship, and costs related to production on a short timeline. Mot. at 20; *see* Dkt. 8 at 6-7, 14-16, 20. But similarly situated subpoena recipients—with the same doctor-patient relationships—have complied without any disruption or hindrance, and to the extent patient records are at issue, Congress specifically contemplated that issue and provided specific limitations on the use of such records in HIPAA. 18 U.S.C. § 3486(e). And the costs of production are entirely self-inflicted. The only apparent reason that it will take "several months" to collect responsive data is because RIH, to this point, has refused to comply with the subpoena, despite having had ten months to do so and representing that it was working toward compliance. Dkt. 8 at 10.

12

* * *

The subpoena meets this Court's prerequisites for enforcement. Accordingly, the district court did not abuse its discretion in enforcing it.

### B.    RIH's contrary arguments fail.

Seeking to avoid compliance with a validly issued subpoena, RIH offers four responses. None shows a likelihood of success on the merits.

1. RIH first argues that the district court violated its due process rights by enforcing the subpoena before RIH filed a response. This argument fails several times over. This Court has held that a district court does not violate a party's due process rights by ruling before a response is filed where "the response would [not] have affected the outcome." *United States v. Rand*, 924 F.3d 140, 145 (5th Cir. 2019). And, as discussed above, that standard is being applied here in the context of administrative-subpoena enforcement proceedings, which are "summary" proceedings, *Burlington*, 983 F.2d at 637, that involve a "strictly limited" judicial inquiry, *Sandsend Fin.*, 878 F.2d at 879.

Here, the government submitted a detailed enforcement petition explaining the basis for the investigation, the statutory authority for the subpoena, the categories of information sought, and RIH's prolonged noncompliance. *See* Dkt. 1, 1-1. The district court reviewed those submissions and granted the petition after concluding that the subpoena satisfied the governing—and narrow—standards. Nothing required the district court to (further) delay enforcement pending full adversarial

13

briefing—particularly where the subpoena had already been outstanding for nearly ten months and RIH had never sought quashal or modification of the subpoena. *See* 18 U.S.C. § 3486(a)(5).

In any event, RIH's due process argument is particularly unlikely to succeed at this stage because the district court has now considered and rejected the arguments RIH presses. In denying a stay pending appeal, the district court addressed RIH's procedural objection, venue argument, and merits challenges at length—and concluded that RIH had "fail[ed] to demonstrate a likelihood of success on the merits." Stay Order at 8; *see id.* at 3-8. The court specifically explained that it had considered "the arguments in opposition that have been made to other district courts," together with RIH's present arguments, and nonetheless concluded "the Government's inquiry is legitimate" and "the records sought are relevant." *Id.* at 4. In short, "RIH's opposition would not have changed the outcome of the Court's ruling" on the petition to enforce. *Id.* at 6. Given that the district court has now expressly determined that RIH's arguments would not have altered the outcome below, RIH cannot plausibly contend that it is likely to obtain reversal from this Court based on the timing of the district court's ruling. *Cf. Sandsend*, 878 F.2d at 881 (reversing quashal order and directing enforcement of subpoena because there was "no basis in the record for quashing the subpoena" despite "abundance of procedural miscues" by district court).

14

Against this backdrop, RIH's reliance on cases like *Sandsend Financial Consultants* and *Texas Keystone, Inc. v. Prime Natural Resources, Inc.*, 694 F.3d 548 (5th Cir. 2012), is misplaced. As the district court explained, those precedents, "like nearly all of RIH's cited authority, involve[] a motion to quash a subpoena, not enforcement of one." Stay Order at 3. Moreover, unlike here, in those cases the district court never issued an order expressly considering the nonmoving party's arguments and explaining why they fail. And here, unlike those cases, RIH did not invoke its statutory right to seek quashal or modification of the subpoena, instead delaying for ten months while producing virtually nothing. RIH has not been "'robbed' . . . of 'its right to be heard,'" Mot. at 10 (quoting *Sandsend*, 878 F.2d at 881).

**2.** RIH's challenge to venue in the Northern District of Texas has no chance of success. HIPAA authorizes enforcement in "any court of the United States within the jurisdiction of which the investigation is carried on." 18 U.S.C. § 3486(c). That standard is satisfied here. As the government explained in an ex parte declaration from the Acting Director of the Enforcement and Affirmative Litigation Branch that the district court credited, "there is substantial operational and decision-making control of the investigation being exercised at the U.S. Attorney's Office in the Northern District of Texas, along with several subjects and potential targets of the investigation located therein." Stay Order at 6 & n.8 (citing Sealed Hsiao Declaration (ex parte), Dkt. No 10-1). That is all the text of HIPAA requires.

15

RIH does not grapple with the text of HIPAA in asserting that for nationwide investigations, venue only lies in the district where the investigation's "command center" or "hub" is located. Mot. 14. But HIPAA provides for venue (*inter alia*) in "*any* court of the United States within the jurisdiction of which the investigation *is carried on*," 18 U.S.C. § 3486(c) (emphasis added), not just in the so-called "hub" of the investigation. Congress easily could have restricted venue to the district where the investigation is "primarily conducted" or "principally managed," but it did not. Congress instead used venue language that readily contemplates venue lying simultaneously in multiple districts. And that choice makes good sense: Section 3486 authorizes subpoenas issued in support of criminal investigations, which commonly involve witnesses, subjects, documentary evidence, and investigative personnel located across numerous districts. Yet RIH's "command center" theory would require courts to somehow identify a single judicial district as the investigation's true locus, even though Congress imposed no such requirement.

The cases on which RIH relies are not to the contrary: they also recognize that where an agency is investigating multiple potential targets based on a nationwide practice, venue may lie where any of the subjects are located or "wherever suspect practices are investigated to any substantial degree." *FTC v. Jim Walter Corp.*, 651 F.2d 251, 254 (5th Cir. 1981); *see N.L.R.B. v. Cooper Tire & Rubber Co.*, 438 F.3d 1198, 1204 (D.C. Cir. 2006) (holding that subpoena could not be enforced in Washington D.C. to investigate conduct in Mississippi "in the absence of [a] nationwide investigation").

16

**3.** RIH next argues that "the subpoena lacks a congressionally authorized and legitimate investigatory purpose." Mot. at 16. But this argument chiefly rests on contentions not properly considered in a subpoena enforcement proceeding. RIH contends at length that the Government is pursuing an invalid theory under the FDCA, namely that "off-label use of puberty blockers and cross-sex hormones is a violation of the FDCA." which RIH thinks would sweep up "off-label prescribing." Mot. at 17-19. But the Government has never argued that off-label prescribing alone triggers FDCA liability. *See* Dkt. 11 at 7 ("The Government does not contend that the mere act of off-label prescribing by a physician constitutes an FDCA offense."); Stay Order at 7 ("[T]he Government's Petition does not advance this argument."). Instead, the Government has merely argued that a white coat "does not confer immunity" from all federal healthcare law, Dkt. 11 at 7-8, and that, for example, RIH could have engaged in a conspiracy with pharmaceutical companies "involving the illegal misbranding of drugs and distribution of misbranded drugs or unapproved new drugs." Dkt. 1 at 8; *supra* at 5.[2]

In any case, as the district court explained, it is well settled that "questions concerning the scope of an agency's substantive authority to regulate are not to be

---

[2] RIH's position to the contrary, *see* Mot. at 18-19, is belied by the text of the statutes on which it relies. 21 U.S.C. § 396 applies to "device[s]," not drugs. And 21 U.S.C. § 352(f) does not provide that "FDCA misbranding liability attaches only to those who manufacture and distribute a drug." Mot. at 19.

resolved in subpoena enforcement proceedings." *Sturm*, 84 F.3d at 5; *e.g.*, *Donovan v. Shaw*, 668 F.2d 985, 989 (8th Cir. 1982) ("[A] subpoena enforcement proceeding is not the proper forum in which to litigate the question of coverage under a particular federal statute."); Stay Order at 7. This rule emerges from the fact that subpoena enforcement proceedings are "summary" and not mean to be "bogged down by premature challenges to [an agency's] regulatory jurisdiction." *Sturm*, 84 F.3d at 5 (citation and quotation omitted). All a court must conclude, and as the district court correctly concluded here, is that an agency's authority is not "obviously apocryphal." *Sturm*, 84 F.3d at 5. RIH thus lacks a likelihood of success on the merits.

**4.** Finally, RIH argues that the subpoena "fails because it is overly broad and burdensome." Mot. at 20. On overbreadth, RIH points to the requests for patient records. Mot. at 20. But, as explained above, these requests are relevant to the Government's investigation and not "atypical in this area." *See supra* at 7-11. As for the burden of compliance, the Government has already addressed why RIH's arguments fail to persuade. *See supra* at 11-12. Because these arguments are destined to fail on appeal, they provide no basis for a stay, as the district court correctly concluded. Stay Order at 7-8.

## II.    The non-merits factors favor the government.

The remaining considerations—irreparable harm, balance of equities, and public interest—likewise favor denying RIH's motion.

18

**A.** RIH cannot show that compliance will irreparably harm it. RIH first claims (at 12) that "this litigation will become moot" if it complies with the subpoena, but the Supreme Court has held the opposite, as the district court observed. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12–15 (1992) ("[T]his case is not moot because if the summons were improperly issued or enforced a court could order that the IRS' copies of the tapes be either returned or destroyed."); *see* Stay Order at 8-9.

RIH says that the costs of compliance would irreparably harm it. But courts, including the district court, have rejected precisely that claim. Stay Order at 9 (citing *Nikon Corp. v. GlobalFoundries U.S., Inc.*, No. 17- MC-80071, 2017 WL 4865549, at *2 (N.D. Cal. Oct. 26, 2017), and *Hurt v. Dime Sav. Bank*, 151 F.R.D. 30, 31 (E.D.N.Y. 1993)). And unlike the case RIH cites (at 22), RIH does not allege that the costs of complying would put it out of business. *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024). That is unsurprising, given that RIH is a large hospital owned by a multi-hospital parent company. Spending money to comply with government subpoenas is unremarkable and certainly not irreparable for such an institution. And that purported harm is even less understandable here, when RIH sat on the subpoena for ten months and produced one document.

RIH next speculates that compliance may injure patient relationships, but it has not ruled out the possibility of anonymizing patient records (*see* Mot. at 23 n.15), and it advises its patients (apparently without harming patient relationships) that it may disclose their personal health information for many purposes, including in response to

19

a subpoena or as ordered by a court, to insurance companies, for training purposes, for research, and even for fundraising.  Lifespan Joint Privacy Notice at 5, 7, available at https://www.brownhealth.org/sites/default/files/2021-07/EN-Joint-Privacy-Notice-English_2021.pdf.  That is standard healthcare practice: delivering healthcare involves routine disclosures of personal health information through a network of clinicians, laboratories, pharmacies, quality assurance reviewers, insurers, billing companies, third-party administrators, accreditation bodies, and regulators. RIH protests (at 23 n.16) that its privacy policy "only allows release for a legitimate law enforcement purpose, which this investigation is not," but that simply rehashes RIH's failed arguments on the merits.  Regardless, its privacy policy also warns of disclosures in response to court orders, Privacy Notice at 7, like the district court's enforcement order.

Last, RIH (at 23-24) cites a recent Supreme Court decision, but that decision addressed standing to assert First Amendment associational rights, not the higher standard of irreparable harm. *See First Choice Women's Res. Ctrs., Inc. v. Davenport*, 2026 WL 1153029, at *12 (2026).  What suffices to establish "objectively reasonable chill" for standing purposes in that context, *id.* at *9, is not material to RIH's obligation in this posture, which is showing "more than [a] speculative" or "unfounded fear" to support its irreparable harm arguments.  *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022).  RIH offers nothing to support its entirely speculative fear of inadvertent publication of responsive documents while this appeal is pending.

20

**B.** As for the balance of equities and the public interest, those considerations merge when the government is the opposing party, *Nken*, 556 U.S. at 435, and they strongly favor the government. The public and the government have a "compelling interest in finding, convicting, and punishing those who violate the law." *Samia v. United States*, 599 U.S. 635, 655 (2023) (citation omitted); *see also Newsom v. Trump*, 141 F.4th 1032, 1054 (9th Cir. 2025) (recognizing government's "uncontested interest" in the "faithful execution of law."). That interest far outweighs subpoena recipients' interest in prolonging their noncompliance and likewise "outweighs the privacy rights of those whose [medical] records" are sought via a properly issued HIPAA subpoena, "particularly in light of the limitation placed on uses of subpoenaed information by § 3486." *In re Subpoena Duces Tecum*, 228 F.3d at 351.

**CONCLUSION**

The Court should deny RIH's motion.

Respectfully submitted,

RYAN RAYBOULD
United States Attorney

BRETT A. SHUMATE
Assistant Attorney General

ETHAN WOMBLE
*Assistant United States Attorney*
*U.S. Attorney's Office*
*801 Cherry Street, Suite 1700*
*Forth Worth, Texas 76102*

BRAD HINSHELWOOD
SARAH WELCH
BRANTLEY MAYERS
*/s/ John Bailey*
JOHN BAILEY
*Attorneys, Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
(202) 514-3180

May 2026

22

**CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ John Bailey*

John Bailey

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(1)(E) because it contains 5,112 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(2)(A) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ John Bailey*
John Bailey